# FEDERAL ELECTION COMMISSION *v.* MASSACHU-
# SETTS CITIZENS FOR LIFE, INC.

No. 85–701.   Argued October 7, 1986—Decided December 15, 1986

BRENNAN, J., announced the judgment of the Court and delivered the opinion for a unanimous Court with respect to Parts I and II, an opinion of the Court with respect to Parts III–B and III–C, in which MARSHALL, POWELL, O'CONNOR, and SCALIA, JJ., joined, and an opinion with respect to Part III–A, in which MARSHALL, POWELL, and SCALIA, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 265. REHNQUIST, C. J., filed an opinion concurring in part and dissenting in part, in which WHITE, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 266. WHITE, J., filed a separate statement, *post*, p. 271.

*Charles N. Steele* argued the cause for appellant. With him on the briefs was *Richard B. Bader.*

*Francis H. Fox* argued the cause for appellee. With him on the brief was *E. Susan Garsh.**

---

*Roger M. Witten, William T. Lake, Carol F. Lee,* and *Archibald Cox* filed a brief for Common Cause as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Marjorie Heins, Burt Neuborne,* and *Jack Novik;* for the Catholic League for Religious and Civil Rights by *Steven Frederick McDowell;* for the Chamber of Commerce of the United States by *Judith K. Richmond, Stephen A. Bokat, Robin S. Conrad,* and *Jan W. Baran;* for the Home Builders Association of Massachusetts by *Wayne S. Henderson;* for the National Rifle Association of America by *James J.*

JUSTICE BRENNAN announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–B, and III–C, and an opinion with respect to Part III–A, in which JUSTICE MARSHALL, JUSTICE POWELL, and JUSTICE SCALIA join.

The questions for decision here arise under § 316 of the Federal Election Campaign Act (FECA or Act), 90 Stat. 490, as renumbered and amended, 2 U. S. C. § 441b. The first question is whether appellee Massachusetts Citizens for Life, Inc. (MCFL), a nonprofit, nonstock corporation, by financing certain activity with its treasury funds, has violated the restriction on independent spending contained in § 441b. That section prohibits corporations from using treasury funds to make an expenditure "in connection with" any federal election, and requires that any expenditure for such purpose be financed by voluntary contributions to a separate segregated fund. If appellee has violated § 441b, the next question is whether application of that section to MCFL's conduct is constitutional. We hold that the appellee's use of its treasury funds is prohibited by § 441b, but that § 441b is unconstitutional as applied to the activity of which the Federal Election Commission (FEC or Commission) complains.

## I

### A

MCFL was incorporated in January 1973 as a nonprofit, nonstock corporation under Massachusetts law. Its corporate purpose as stated in its articles of incorporation is:

"To foster respect for human life and to defend the right to life of all human beings, born and unborn, through educational, political and other forms of activities and in

Featherstone and Richard E. Gardiner; and for Joseph M. Scheidler et al. by Edward R. Grant and Maura K. Quinlan.

Jane E. Kirtley, David Barr, Nancy H. Hendry, J. Laurent Scharff, and Bruce W. Sanford filed a brief for the Reporters Committee for Freedom of the Press et al. as amici curiae.

addition to engage in any other lawful act or activity for which corporations may be organized . . . ." App. 84.

MCFL does not accept contributions from business corporations or unions. Its resources come from voluntary donations from "members," and from various fundraising activities such as garage sales, bake sales, dances, raffles, and picnics. The corporation considers its "members" those persons who have either contributed to the organization in the past or indicated support for its activities.[1]

Appellee has engaged in diverse educational and legislative activities designed to further its agenda. It has organized an ecumenical prayer service for the unborn in front of the Massachusetts Statehouse; sponsored a regional conference to discuss the issues of abortion and euthanasia; provided speakers for discussion groups, debates, lectures, and media programs; and sponsored an annual March for Life. In addition, it has drafted and submitted legislation, some of which has become law in Massachusetts; sponsored testimony on proposed legislation; and has urged its members to contact their elected representatives to express their opinion on legislative proposals.

MCFL began publishing a newsletter in January 1973. It was distributed as a matter of course to contributors, and, when funds permitted, to noncontributors who had expressed support for the organization. The total distribution of any one issue has never exceeded 6,000. The newsletter was published irregularly from 1973 through 1978: three times in 1973, five times in 1974, eight times in 1975, eight times in 1976, five times in 1977, and four times in 1978. *Id.*, at 88.

---

[1] MCFL concedes that under this Court's decision in *FEC* v. *National Right to Work Committee*, 459 U. S. 197 (1982), such a definition does not permit it to solicit contributions from such persons for use by a separate segregated fund established under the Act. That case held that in order to be considered a "member" of a nonstock corporation under the Act, one must have "some relatively enduring and independently significant financial or organizational attachment" to the corporation. *Id.*, at 204.

Each of the newsletters bore a masthead identifying it as the "Massachusetts Citizens for Life Newsletter," as well as a volume and issue number. The publication typically contained appeals for volunteers and contributions and information on MCFL activities, as well as on matters such as the results of hearings on bills and constitutional amendments, the status of particular legislation, and the outcome of referenda, court decisions, and administrative hearings. Newsletter recipients were usually urged to contact the relevant decisionmakers and express their opinion.

## B

In September 1978, MCFL prepared and distributed a "Special Edition" prior to the September 1978 primary elections. While the May 1978 newsletter had been mailed to 2,109 people and the October 1978 newsletter to 3,119 people, more than 100,000 copies of the "Special Edition" were printed for distribution. The front page of the publication was headlined "EVERYTHING YOU NEED TO KNOW TO VOTE PRO-LIFE," and readers were admonished that "[n]o pro-life candidate can win in November without your vote in September." "VOTE PRO-LIFE" was printed in large bold-faced letters on the back page, and a coupon was provided to be clipped and taken to the polls to remind voters of the name of the "pro-life" candidates. Next to the exhortation to vote "pro-life" was a disclaimer: "This special election edition does not represent an endorsement of any particular candidate." *Id.*, at 101.

To aid the reader in selecting candidates, the flyer listed the candidates for each state and federal office in every voting district in Massachusetts, and identified each one as either supporting or opposing what MCFL regarded as the correct position on three issues. A "y" indicated that a candidate supported the MCFL view on a particular issue and an "n" indicated that the candidate opposed it. An asterisk was placed next to the names of those incumbents who had made

a "special contribution to the unborn in maintaining a 100% pro-life voting record in the state house by actively support- ing MCFL legislation." While some 400 candidates were running for office in the primary, the "Special Edition" fea- tured the photographs of only 13. These 13 had received a triple "y" rating, or were identified either as having a 100% favorable voting record or as having stated a position consist- ent with that of MCFL. No candidate whose photograph was featured had received even one "n" rating.

The "Special Edition" was edited by an officer of MCFL who was not part of the staff that prepared the MCFL news- letters. The "Special Edition" was mailed free of charge and without request to 5,986 contributors, and to 50,674 others whom MCFL regarded as sympathetic to the organization's purposes. The Commission asserts that the remainder of the 100,000 issues were placed in public areas for general dis- tribution, but MCFL insists that no copies were made avail- able to the general public.[2] The "Special Edition" was not identified on its masthead as a special edition of the regular newsletter, although the MCFL logotype did appear at its top. The words "Volume 5, No. 3, 1978" were apparently handwritten on the Edition submitted to the FEC, but the record indicates that the actual Volume 5, No. 3, was distrib- uted in May and June 1977. The corporation spent $9,812.76 to publish and circulate the "Special Edition," all of which was taken from its general treasury funds.

A complaint was filed with the Commission alleging that the "Special Edition" was a violation of § 441b. The com- plaint maintained that the Edition represented an expendi- ture of funds from a corporate treasury to distribute to the general public a campaign flyer on behalf of certain political candidates. The FEC found reason to believe that such a

---

[2] The FEC submitted an affidavit from a person who stated that she obtained a copy of the "Special Edition" at a statewide conference of the National Organization for Women, where a stack of about 200 copies were available to the general public. App. 174.

violation had occurred, initiated an investigation, and determined that probable cause existed to believe that MCFL had violated the Act. After conciliation efforts failed, the Commission filed a complaint in the District Court under § 437g(a)(6)(A), seeking a civil penalty and other appropriate relief.

Both parties moved for summary judgment. The District Court granted MCFL's motion, holding that: (1) the election publications could not be regarded as "expenditures" under § 441b(b)(2); (2) the "Special Edition" was exempt from the statutory prohibition by virtue of § 431(9)(B)(i), which in general exempts news commentary distributed by a periodical publication unaffiliated with any candidate or political party; and (3) if the statute applied to MCFL, it was unconstitutional as a violation of the First Amendment. 589 F. Supp. 646, 649 (Mass. 1984).

On appeal, the Court of Appeals for the First Circuit held that the statute was applicable to MCFL, but affirmed the District Court's holding that the statute as so applied was unconstitutional. 769 F. 2d 13 (1985). We granted certiorari, 474 U. S. 1049 (1986), and now affirm.

II

We agree with the Court of Appeals that the "Special Edition" is not outside the reach of § 441b. First, we find no merit in appellee's contention that preparation and distribution of the "Special Edition" does not fall within that section's definition of "expenditure." Section 441b(b)(2) defines "contribution or expenditure" as the provision of various things of value "*to* any candidate, campaign committee, or political party or organization, in connection with any election . . ." (emphasis added). MCFL contends that, since it supplied nothing to any candidate or organization, the publication is not within § 441b. However, the general definitions section of the Act contains a broader definition of "expenditure," including within that term the provision of anything of value

made *"for the purpose of influencing* any election for Federal office . . . ." 2 U. S. C. § 431(9)(A)(i) (emphasis added). Since the language of the statute does not alone resolve the issue, we must look to the legislative history of § 441b to determine the scope of the term "expenditure."[3]

That history clearly confirms that § 441b was meant to proscribe expenditures in connection with an election. We have exhaustively recounted the legislative history of the predecessors of this section in prior decisions. See *Pipefitters* v. *United States,* 407 U. S. 385, 402–409 (1972); *United States* v. *Automobile Workers,* 352 U. S. 567, 570–587 (1957). This history makes clear that Congress has long regarded it as insufficient merely to restrict payments made directly to candidates or campaign organizations. The first explicit expression of this came in 1947, when Congress passed the Taft-Hartley Act, ch. 120, § 304, 61 Stat. 136, 159, as amended, 18 U. S. C. § 610 (1970 ed.), the criminal statute prohibiting corporate contributions and expenditures to candidates. The statute as amended forbade any corporation or labor organization to make a "contribution or expenditure in connection with any election . . ." for federal office. The 1946 Report of the House Special Committee to Investigate Campaign

---

[3] MCFL argues that the definition in the general definitions section is not as broad as it appears, for § 431(9)(B)(v) says that nothing shall be considered an "expenditure" under § 431 that would not be regarded as such under § 441b(b). Therefore, MCFL argues, the definition of expenditure under § 431 necessarily incorporates § 441b's restriction of that term to payments *to* a candidate. It is puzzling, however, why § 431 would in one subsection purport to define an expenditure as a payment made for the purpose of influencing an election and in another subsection eliminate precisely that type of activity from the ambit of its definition. The answer may lie in the fact that § 441b(b)(2) says that expenditures "include" payments to a candidate, a term that indicates that activities not specifically enumerated in that section may nonetheless be encompassed by it. In any event, the need for such speculation signals that the language of the statute is not on its face dispositive.

Expenditures explained the rationale for the amendment, noting that it would undermine the basic objective of § 610

> "if it were assumed that the term 'making any contribution' related only to the donating of money directly to a candidate, and excluded the vast expenditures of money in the activities herein shown to be engaged in extensively. Of what avail would a law be to prohibit the contributing direct to a candidate and yet permit the expenditure of large sums in his behalf?" H. R. Rep. No. 2739, 79th Cong., 2d Sess., 40, quoted in *Automobile Workers, supra,* at 581.

During the legislative debate on the bill, Senator Taft was asked whether § 610 permitted a newspaper published by a railway union to put out a special edition in support of a political candidate, or whether such activity would be considered a political expenditure. The Senator replied: "If it were supported by union funds contributed by union members as union dues it would be a violation of the law, yes. It is exactly as if a railroad itself, using its stockholders' funds, published such an advertisement in the newspaper supporting one candidate as against another . . . ." 93 Cong. Rec. 6436–6437 (1947).

*United States* v. *CIO,* 335 U. S. 106 (1948), narrowed the scope of this prohibition, by permitting the use of union funds to publish a special edition of the weekly CIO News distributed to union members and purchasers of the issue. In *Automobile Workers, supra,* however, we held that a union was subject to indictment for using union dues to sponsor political advertisements on commercial television. Distinguishing *CIO,* we stated that the concern of the statute "is the use of corporation or union funds to influence the public at large to vote for a particular candidate or a particular party." 352 U. S., at 589.

The Federal Election Campaign Act enacted the prohibition now found in § 441b. This portion of the Act simply ratified the existing understanding of the scope of § 610. See

*Pipefitters, supra,* at 410–411. Representative Hansen, the sponsor of the provision, declared:

> "The effect of this language is to carry out the basic intent of section 610, which is to prohibit the use of union or corporate funds for active electioneering directed at the general public on behalf of a candidate in a Federal election." 117 Cong. Rec. 43379 (1971).

The Representative concluded:

> "The net effect of the amendment, therefore, is to tighten and clarify the provisions of section 610 of title 18, United States Code, and to codify the case law." *Ibid.*[4]

Thus, the fact that § 441b uses the phrase "to any candidate . . . in connection with any election," while § 610 provided "in connection with any primary election," is not evidence that Congress abandoned its restriction, in force since 1947, on expenditures on behalf of candidates. We therefore find no merit in MCFL's argument that only payments to a candidate or organization fall within the scope of § 441b.

Appellee next argues that the definition of an expenditure under § 441b necessarily incorporates the requirement that a communication "expressly advocate" the election of candidates, and that its "Special Edition" does not constitute express advocacy. The argument relies on the portion of *Buckley* v. *Valeo,* 424 U. S. 1 (1976), that upheld the disclosure requirement for expenditures by individuals other than candidates and by groups other than political committees. See 2 U. S. C. § 434(c). There, in order to avoid problems of overbreadth, the Court held that the term "expenditure" encompassed "only funds used for communications that expressly advocate the election or defeat of a clearly identified

---

[4] See also 117 Cong. Rec. 43381 (1971) (remarks of Rep. Hays); *id.,* at 43383–43385 (remarks of Rep. Thompson); *id.,* at 43388–43389 (remarks of Reps. Steiger and Gude).

candidate." 424 U. S., at 80 (footnote omitted). The rationale for this holding was:

> "[T]he distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various issues, but campaigns themselves generate issues of public interest." *Id.*, at 42 (footnote omitted).

We agree with appellee that this rationale requires a similar construction of the more intrusive provision that directly regulates independent spending. We therefore hold that an expenditure must constitute "express advocacy" in order to be subject to the prohibition of § 441b. We also hold, however, that the publication of the "Special Edition" constitutes "express advocacy."

*Buckley* adopted the "express advocacy" requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons. We therefore concluded in that case that a finding of "express advocacy" depended upon the use of language such as "vote for," "elect," "support," etc., *Buckley, supra,* at 44, n. 52. Just such an exhortation appears in the "Special Edition." The publication not only urges voters to vote for "pro-life" candidates, but also identifies and provides photographs of specific candidates fitting that description. The Edition cannot be regarded as a mere discussion of public issues that by their nature raise the names of certain politicians. Rather, it provides in effect an explicit directive: vote for these (named) candidates. The fact that this message is marginally less direct than "Vote for Smith" does not change its essential nature. The Edition goes beyond issue discussion to express electoral advocacy. The disclaimer of endorsement cannot negate this fact. The "Special Edition" thus falls

squarely within § 441b, for it represents express advocacy of the election of particular candidates distributed to members of the general public.

Finally, MCFL argues that it is entitled to the press exemption under 2 U. S. C. § 431(9)(B)(i) reserved for

> "any news story, commentary, or editorial distributed through the facilities of any . . . newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate."

MCFL maintains that its regular newsletter is a "periodical publication" within this definition, and that the "Special Edition" should be regarded as just another issue in the continuing newsletter series. The legislative history on the press exemption is sparse; the House of Representatives' Report on this section states merely that the exemption was designed to

> "make it plain that it is not the intent of Congress in the present legislation to limit or burden in any way the first amendment freedoms of the press or of association. [The exemption] assures the unfettered right of the newspapers, TV networks, and other media to cover and comment on political campaigns." H. R. Rep. No. 93–1239, p. 4 (1974).

We need not decide whether the regular MCFL newsletter is exempt under this provision, because, even assuming that it is, the "Special Edition" cannot be considered comparable to any single issue of the newsletter. It was not published through the facilities of the regular newsletter, but by a staff which prepared no previous or subsequent newsletters. It was not distributed to the newsletter's regular audience, but to a group 20 times the size of that audience, most of whom were members of the public who had never received the newsletter. No characteristic of the Edition associated it in any way with the normal MCFL publication. The MCFL

masthead did not appear on the flyer, and, despite an apparent belated attempt to make it appear otherwise, the Edition contained no volume and issue number identifying it as one in a continuing series of issues.

MCFL protests that determining the scope of the press exemption by reference to such factors inappropriately focuses on superficial considerations of form. However, it is precisely such factors that in combination permit the distinction of campaign flyers from regular publications. We regard such an inquiry as essential, since we cannot accept the notion that the distribution of such flyers by entities that happen to publish newsletters automatically entitles such organizations to the press exemption. A contrary position would open the door for those corporations and unions with in-house publications to engage in unlimited spending directly from their treasuries to distribute campaign material to the general public, thereby eviscerating § 441b's prohibition.[5]

In sum, we hold that MCFL's publication and distribution of the "Special Edition" is in violation of § 441b. We therefore turn to the constitutionality of that provision as applied to appellee.

## III

### A

Independent expenditures constitute expression " 'at the core of our electoral process and of the First Amendment freedoms.' " *Buckley*, 424 U. S., at 39 (quoting *Williams* v. *Rhodes*, 393 U. S. 23, 32 (1968)). See also *FEC* v. *National Conservative Political Action Committee*, 470 U. S. 480, 493 (1985) *(NCPAC)* (independent expenditures "produce speech at the core of the First Amendment"). We must therefore

---

[5] Nor do we find the "Special Edition" akin to the normal business activity of a press entity deemed by some lower courts to fall within the exemption, such as the distribution of a letter soliciting subscriptions, see *FEC* v. *Phillips Publishing Co.*, 517 F. Supp. 1308, 1313 (DC 1981), or the dissemination of publicity, see *Reader's Digest Assn.* v. *FEC*, 509 F. Supp. 1210 (SDNY 1981).

determine whether the prohibition of § 441b burdens political speech, and, if so, whether such a burden is justified by a compelling state interest. *Buckley, supra,* at 44–45.

The FEC minimizes the impact of the legislation upon MCFL's First Amendment rights by emphasizing that the corporation remains free to establish a separate segregated fund, composed of contributions earmarked for that purpose by the donors, that may be used for unlimited campaign spending. However, the corporation is *not* free to use its general funds for campaign advocacy purposes. While that is not an absolute restriction on speech, it is a substantial one. Moreover, even to speak through a segregated fund, MCFL must make very significant efforts.

If it were not incorporated, MCFL's obligations under the Act would be those specified by § 434(c), the section that prescribes the duties of "[e]very person (other than a political committee)."[6] Section 434(c) provides that any such person that during a year makes independent expenditures exceeding $250 must: (1) identify all contributors who contribute in a given year over $200 in the aggregate in funds to influence elections, § 434(c)(1); (2) disclose the name and address of recipients of independent expenditures exceeding $200 in the aggregate, along with an indication of whether the money was used to support or oppose a particular candidate, § 434(c)(2)(A); and (3) identify any persons who make contributions over $200 that are earmarked for the purpose of furthering independent expenditures, § 434(c)(2)(C). All unincorporated organizations whose major purpose is not campaign advocacy, but who occasionally make independent ex-

---

[6] In *Buckley* v. *Valeo,* 424 U. S. 1 (1976), this Court said that an entity subject to regulation as a "political committee" under the Act is one that is either "under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.,* at 79. It is undisputed on this record that MCFL fits neither of these descriptions. Its central organizational purpose is issue advocacy, although it occasionally engages in activities on behalf of political candidates.

penditures on behalf of candidates, are subject only to these regulations.

Because it is incorporated, however, MCFL must establish a "separate segregated fund" if it wishes to engage in any independent spending whatsoever. §§ 441b(a),(b)(2)(C). Since such a fund is considered a "political committee" under the Act, § 431(4)(B), all MCFL independent expenditure activity is, as a result, regulated as though the organization's major purpose is to further the election of candidates. This means that MCFL must comply with several requirements in addition to those mentioned. Under § 432, it must appoint a treasurer, § 432(a); ensure that contributions are forwarded to the treasurer within 10 or 30 days of receipt, depending on the amount of contribution, § 432(b)(2); see that its treasurer keeps an account of every contribution regardless of amount, the name and address of any person who makes a contribution in excess of $50, all contributions received from political committees, and the name and address of any person to whom a disbursement is made regardless of amount, § 432(c); and preserve receipts for all disbursements over $200 and all records for three years, §§ 432(c),(d). Under § 433, MCFL must file a statement of organization containing its name, address, the name of its custodian of records, and its banks, safety deposit boxes, or other depositories, §§ 433(a),(b); must report any change in the above information within 10 days, § 433(c); and may dissolve only upon filing a written statement that it will no longer receive any contributions nor make disbursements, and that it has no outstanding debts or obligations, § 433(d)(1).

Under § 434, MCFL must file either monthly reports with the FEC or reports on the following schedule: quarterly reports during election years, a pre-election report no later than the 12th day before an election, a postelection report within 30 days after an election, and reports every 6 months during nonelection years, §§ 434(a)(4)(A),(B). These reports must contain information regarding the amount of cash on

hand; the total amount of receipts, detailed by 10 different categories; the identification of each political committee and candidate's authorized or affiliated committee making contributions, and any persons making loans, providing rebates, refunds, dividends, or interest or any other offset to operating expenditures in an aggregate amount over $200; the total amount of all disbursements, detailed by 12 different categories; the names of all authorized or affiliated committees to whom expenditures aggregating over $200 have been made; persons to whom loan repayments or refunds have been made; the total sum of all contributions, operating expenses, outstanding debts and obligations, and the settlement terms of the retirement of any debt or obligation. § 434(b). In addition, MCFL may solicit contributions for its separate segregated fund only from its "members," §§ 441b(b)(4)(A), (C), which does not include those persons who have merely contributed to or indicated support for the organization in the past. See *FEC* v. *National Right to Work Committee,* 459 U. S. 197, 204 (1982).

It is evident from this survey that MCFL is subject to more extensive requirements and more stringent restrictions than it would be if it were not incorporated. These additional regulations may create a disincentive for such organizations to engage in political speech. Detailed record-keeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of the records, impose administrative costs that many small entities may be unable to bear.[7] Furthermore, such duties require a far more com-

---

[7] It is true that we acknowledged in *Buckley, supra,* that, although the reporting and disclosure requirements of the Act "will deter some individuals who otherwise might contribute," *id.,* at 68, this is a burden that is justified by substantial Government interests. *Id.,* at 66–68. However, while the effect of additional reporting and disclosure obligations on an organization's *contributors* may not necessarily constitute an additional burden on speech, the administrative costs of complying with such increased responsibilities may create a disincentive for the organization itself to speak.

plex and formalized organization than many small groups could manage. Restriction of solicitation of contributions to "members" vastly reduces the sources of funding for organizations with either few or no formal members, directly limiting the ability of such organizations to engage in core political speech. It is not unreasonable to suppose that, as in this case, an incorporated group of like-minded persons might seek donations to support the dissemination of their political ideas and their occasional endorsement of political candidates, by means of garage sales, bake sales, and raffles. Such persons might well be turned away by the prospect of complying with all the requirements imposed by the Act. Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports, and to monitor garage sales lest nonmembers take a fancy to the merchandise on display, it would not be surprising if at least some groups decided that the contemplated political activity was simply not worth it.[8]

Thus, while § 441b does not remove all opportunities for independent spending by organizations such as MCFL, the avenue it leaves open is more burdensome than the one it forecloses. The fact that the statute's practical effect may be to discourage protected speech is sufficient to characterize § 441b as an infringement on First Amendment activities. In *Freedman* v. *Maryland*, 380 U. S. 51 (1965), for instance, we held that the absence of certain procedural safeguards rendered unconstitutional a State's film censorship program. Such procedures were necessary, we said, because, as a practical matter, without them "it may prove too burdensome to seek review of the censor's determination." *Id.*, at 59.

---

[8] The fact that MCFL established a political committee in 1980 does not change this conclusion, for the corporation's speech may well have been inhibited due to its inability to form such an entity before that date. Furthermore, other organizations comparable to MCFL may not find it feasible to establish such a committee, and may therefore decide to forgo engaging in independent political speech.

*Speiser* v. *Randall*, 357 U. S. 513 (1958), reviewed a state program under which taxpayers applying for a certain tax exemption bore the burden of proving that they did not advocate the overthrow of the United States and would not support a foreign government against this country. We noted: "In practical operation, therefore, this procedural device must necessarily produce a result which the State could not command directly. It can only result in a deterrence of speech which the Constitution makes free." *Id.*, at 526. The same may be said of § 441b, for its practical effect on MCFL in this case is to make engaging in protected speech a severely demanding task.[9]

### B

When a statutory provision burdens First Amendment rights, it must be justified by a compelling state interest. *Williams* v. *Rhodes*, 393 U. S., at 31; *NAACP* v. *Button*, 371 U. S. 415, 438 (1963). The FEC first insists that justification for § 441b's expenditure restriction is provided by this Court's acknowledgment that "the special characteristics of the corporate structure require particularly careful regulation." *National Right to Work Committee, supra,* at 209–210. The Commission thus relies on the long history of regulation of corporate political activity as support for the application of § 441b to MCFL. Evaluation of the Commis-

---

[9] The Commission relies on *Regan* v. *Taxation With Representation,* 461 U. S. 540 (1983), in support of its contention that the requirement that independent spending be conducted through a separate segregated fund does not burden MCFL's First Amendment rights. *Regan,* however, involved the requirement that a nonprofit corporation establish a separate lobbying entity if contributions to the corporation for the conduct of other activities were to be tax deductible. If the corporation chose not to set up such a lobbying arm, it would not be eligible for tax-deductible contributions. Such a result, however, would infringe no protected activity, for there is no right to have speech subsidized by the Government. *Id.*, at 545–546. By contrast, the activity that may be discouraged in this case, independent spending, is core political speech under the First Amendment.

sion's argument requires close examination of the underlying rationale for this longstanding regulation.

We have described that rationale in recent opinions as the need to restrict "the influence of political war chests funneled through the corporate form," *NCPAC*, 470 U. S., at 501; to "eliminate the effect of aggregated wealth on federal elections," *Pipefitters*, 407 U. S., at 416; to curb the political influence of "those who exercise control over large aggregations of capital," *Automobile Workers*, 352 U. S., at 585; and to regulate the "substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization," *National Right to Work Committee*, 459 U. S., at 207.

This concern over the corrosive influence of concentrated corporate wealth reflects the conviction that it is important to protect the integrity of the marketplace of political ideas. It acknowledges the wisdom of Justice Holmes' observation that "the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market . . . ." *Abrams* v. *United States*, 250 U. S. 616, 630 (1919) (Holmes, J., joined by Brandeis, J., dissenting).[10]

Direct corporate spending on political activity raises the prospect that resources amassed in the economic marketplace may be used to provide an unfair advantage in the political marketplace. Political "free trade" does not necessarily require that all who participate in the political marketplace do so with exactly equal resources. See *NCPAC*, *supra* (invali-

---

[10] While this market metaphor has guided congressional regulation in the area of campaign activity, First Amendment speech is not necessarily limited to such an instrumental role. As Justice Brandeis stated in his discussion of political speech in his concurrence in *Whitney* v. *California*, 274 U. S. 357, 375 (1927):

"Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means."

dating limits on independent spending by political committees); *Buckley*, 424 U. S., at 39–51 (striking down expenditure limits in 1971 Campaign Act). Relative availability of funds is after all a rough barometer of public support. The resources in the treasury of a business corporation, however, are not an indication of popular support for the corporation's political ideas. They reflect instead the economically motivated decisions of investors and customers. The availability of these resources may make a corporation a formidable political presence, even though the power of the corporation may be no reflection of the power of its ideas.

By requiring that corporate independent expenditures be financed through a political committee expressly established to engage in campaign spending, § 441b seeks to prevent this threat to the political marketplace. The resources available to *this* fund, as opposed to the corporate treasury, in fact reflect popular support for the political positions of the committee. *Pipefitters, supra,* acknowledged this objective of § 441b in noting the statement of Representative Hansen, its sponsor, that the "'underlying theory'" of this regulation "'is that substantial general purpose treasuries should not be diverted to political purposes,'" and that requiring funding by voluntary contributions would ensure that "'the money collected is that intended by those who contribute to be used for political purposes and not money diverted from another source.'" 407 U. S., at 423–424 (quoting 117 Cong. Rec. 43381 (1971)).[11] See also *Automobile Workers, supra,* at 582

---

[11] While business corporations may not represent the only organizations that pose this danger, they are by far the most prominent example of entities that enjoy legal advantages enhancing their ability to accumulate wealth. That Congress does not at present seek to regulate every possible type of firm fitting this description does not undermine its justification for regulating corporations. Rather, Congress' decision represents the "careful legislative adjustment of the federal electoral laws, in a 'cautious advance, step by step,'" to which we have said we owe considerable deference. *FEC* v. *National Right to Work Committee,* 459 U. S. 197, 209

(Congress added proscription on expenditures to Corrupt Practices Act "to protect the political process from what it deemed to be the corroding effect of money employed in elections by aggregated power"). The expenditure restrictions of § 441b are thus meant to ensure that competition among actors in the political arena is truly competition among ideas.

Regulation of corporate political activity thus has reflected concern not about use of the corporate form *per se*, but about the potential for unfair deployment of wealth for political purposes.[12] Groups such as MCFL, however, do not pose that danger of corruption. MCFL was formed to disseminate political ideas, not to amass capital. The resources it has available are not a function of its success in the economic marketplace, but its popularity in the political marketplace. While MCFL may derive some advantages from its corporate form, those are advantages that redound to its benefit as a political organization, not as a profit-making enterprise. In short, MCFL is not the type of "traditional corporatio[n] organized for economic gain," *NCPAC, supra,* at 500, that has been the focus of regulation of corporate political activity.

*National Right to Work Committee* does not support the inclusion of MCFL within § 441b's restriction on direct independent spending. That case upheld the application to a nonprofit corporation of a different provision of § 441b: the limitation on who can be solicited for contributions to a political committee. However, the political activity at issue in that case was contributions, as the committee had been established for the purpose of making direct contributions to political candidates. 459 U. S., at 200. We have consistently held that restrictions on contributions require less com-

---

(1982) (quoting *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 46 (1937)).

[12] The regulation imposed as a result of this concern is of course distinguishable from the complete foreclosure of any opportunity for political speech that we invalidated in the state referendum context in *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978).

pelling justification than restrictions on independent spending. *NCPAC*, 470 U. S. 480 (1985); *California Medical Assn.* v. *FEC*, 453 U. S. 182, 194, 196–197 (1981); *Buckley, supra,* at 20–22.

In light of the historical role of contributions in the corruption of the electoral process, the need for a broad prophylactic rule was thus sufficient in *National Right to Work Committee* to support a limitation on the ability of a committee to raise money for direct contributions to candidates. The limitation on solicitation in this case, however, means that nonmember corporations can hardly raise any funds at all to engage in political speech warranting the highest constitutional protection. Regulation that would produce such a result demands far more precision than § 441b provides. Therefore, the desirability of a broad prophylactic rule cannot justify treating alike business corporations and appellee in the regulation of independent spending.

The Commission next argues in support of § 441b that it prevents an organization from using an individual's money for purposes that the individual may not support. We acknowledged the legitimacy of this concern as to the dissenting stockholder and union member in *National Right to Work Committee*, 459 U. S., at 208, and in *Pipefitters*, 407 U. S., at 414–415. But such persons, as noted, contribute investment funds or union dues for economic gain, and do not necessarily authorize the use of their money for political ends. Furthermore, because such individuals depend on the organization for income or for a job, it is not enough to tell them that any unhappiness with the use of their money can be redressed simply by leaving the corporation or the union. It was thus wholly reasonable for Congress to require the establishment of a separate political fund to which persons can make voluntary contributions.

This rationale for regulation is not compelling with respect to independent expenditures by appellee. Individuals who contribute to appellee are fully aware of its political purposes, and in fact contribute precisely because they support

those purposes. It is true that a contributor may not be aware of the exact use to which his or her money ultimately may be put, or the specific candidate that it may be used to support. However, individuals contribute to a political organization in part because they regard such a contribution as a more effective means of advocacy than spending the money under their own personal direction. Any contribution therefore necessarily involves at least some degree of delegation of authority to use such funds in a manner that best serves the shared political purposes of the organization and contributor. In addition, an individual desiring more direct control over the use of his or her money can simply earmark the contribution for a specific purpose, an option whose availability does not depend on the applicability of § 441b. Cf. § 434(c)(2)(C) (entities other than political committees must disclose names of those persons making earmarked contributions over $200). Finally, a contributor dissatisfied with how funds are used can simply stop contributing.

The Commission maintains that, even if contributors may be aware that a contribution to appellee will be used for political purposes in general, they may not wish such money to be used for electoral campaigns in particular. That is, persons may desire that an organization use their contributions to further a certain cause, but may not want the organization to use their money to urge support for or opposition to political candidates solely on the basis of that cause. This concern can be met, however, by means far more narrowly tailored and less burdensome than § 441b's restriction on direct expenditures: simply requiring that contributors be informed that their money may be used for such a purpose.

It is true that *National Right to Work Committee, supra,* held that the goal of protecting minority interests justified solicitation restrictions on a nonprofit corporation operating a political committee established to make direct contributions to candidates. As we have noted above, however, the Government enjoys greater latitude in limiting contributions

than in regulating independent expenditures. *Supra,* at 259–260. Given a contributor's awareness of the political activity of appellee, as well as the readily available remedy of refusing further donations, the interest protecting contributors is simply insufficient to support § 441b's restriction on the independent spending of MCFL.

Finally, the FEC maintains that the inapplicability of § 441b to MCFL would open the door to massive undisclosed political spending by similar entities, and to their use as conduits for undisclosed spending by business corporations and unions. We see no such danger. Even if § 441b is inapplicable, an independent expenditure of as little as $250 by MCFL will trigger the disclosure provisions of § 434(c). As a result, MCFL will be required to identify all contributors who annually provide in the aggregate $200 in funds intended to influence elections, will have to specify all recipients of independent spending amounting to more than $200, and will be bound to identify all persons making contributions over $200 who request that the money be used for independent expenditures. These reporting obligations provide precisely the information necessary to monitor MCFL's independent spending activity and its receipt of contributions. The state interest in disclosure therefore can be met in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee under the Act.

Furthermore, should MCFL's independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee. See *Buckley,* 424 U. S., at 79. As such, it would automatically be subject to the obligations and restrictions applicable to those groups whose primary objective is to influence political campaigns. In sum, there is no need for the sake of disclosure to treat MCFL any differently than other organizations that only occasionally engage in independent spending on behalf of candidates.

Thus, the concerns underlying the regulation of corporate political activity are simply absent with regard to MCFL. The dissent is surely correct in maintaining that we should not second-guess a decision to sweep within a broad prohibition activities that differ in degree, but not kind. *Post*, at 268–269. It is not the case, however, that MCFL merely poses less of a threat of the danger that has prompted regulation. Rather, it does not pose such a threat at all. Voluntary political associations do not suddenly present the specter of corruption merely by assuming the corporate form. Given this fact, the rationale for restricting core political speech in this case is simply the desire for a bright-line rule. This hardly constitutes the *compelling* state interest necessary to justify any infringement on First Amendment freedom. While the burden on MCFL's speech is not insurmountable, we cannot permit it to be imposed without a constitutionally adequate justification. In so holding, we do not assume a legislative role, but fulfill our judicial duty—to enforce the demands of the Constitution.

## C

Our conclusion is that § 441b's restriction of independent spending is unconstitutional as applied to MCFL, for it infringes protected speech without a compelling justification for such infringement. We acknowledge the legitimacy of Congress' concern that organizations that amass great wealth in the economic marketplace not gain unfair advantage in the political marketplace.

Regardless of whether that concern is adequate to support application of § 441b to commercial enterprises, a question not before us, that justification does not extend uniformly to all corporations. Some corporations have features more akin to voluntary political associations than business firms, and therefore should not have to bear burdens on independent spending solely because of their incorporated status.

In particular, MCFL has three features essential to our holding that it may not constitutionally be bound by § 441b's

restriction on independent spending. *First,* it was formed for the express purpose of promoting political ideas, and cannot engage in business activities. If political fundraising events are expressly denominated as requests for contributions that will be used for political purposes, including direct expenditures, these events cannot be considered business activities. This ensures that political resources reflect political support. *Second,* it has no shareholders or other persons affiliated so as to have a claim on its assets or earnings. This ensures that persons connected with the organization will have no economic disincentive for disassociating with it if they disagree with its political activity.[13] *Third,* MCFL was not established by a business corporation or a labor union, and it is its policy not to accept contributions from such entities. This prevents such corporations from serving as conduits for the type of direct spending that creates a threat to the political marketplace.

It may be that the class of organizations affected by our holding today will be small. That prospect, however, does not diminish the significance of the rights at stake. Freedom of speech plays a fundamental role in a democracy; as this Court has said, freedom of thought and speech "is the matrix, the indispensable condition, of nearly every other form of freedom." *Palko* v. *Connecticut,* 302 U. S. 319, 327 (1937). Our pursuit of other governmental ends, however, may tempt us to accept in small increments a loss that would

---

[13] This restriction does not deprive such organizations of "members" that can be solicited for donations to a separate segregated fund that makes contributions to candidates, a fund that, under our decision in *National Right to Work Committee,* must be established by all corporations wishing to make such candidate contributions. *National Right to Work Committee* requires that "members" have either a "financial or *organizational* attachment" to the corporation, 459 U. S., at 204 (emphasis added). Our decision today merely states that a corporation that does not have persons affiliated *financially* must fall outside § 441b's prohibition on direct expenditures if it also has the other two characteristics possessed by MCFL that we discuss in text.

be unthinkable if inflicted all at once. For this reason, we must be as vigilant against the modest diminution of speech as we are against its sweeping restriction. Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation. In enacting the provision at issue in this case, Congress has chosen too blunt an instrument for such a delicate task.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

I join Parts I, II, III–B, and III–C, and I concur in the Court's judgment that § 316 of the Federal Election Campaign Act (Act), 2 U. S. C. § 441b, is unconstitutional as applied to the conduct of appellee Massachusetts Citizens for Life, Inc. (MCFL), at issue in this case. I write separately, however, because I am concerned that the Court's discussion of the Act's disclosure requirements may be read as moving away from the teaching of *Buckley* v. *Valeo*, 424 U. S. 1 (1976); see *ante*, at 254–255. In *Buckley*, the Court was concerned not only with the chilling effect of reporting and disclosure requirements on an organization's contributors, 424 U. S., at 66–68, but also with the potential burden of disclosure requirements on a group's own speech. *Id.*, at 74–82. The *Buckley* Court concluded that disclosure of a group's independent campaign expenditures serves the important governmental interest of "shed[ding] the light of publicity" on campaign financing, thereby helping voters to evaluate the constituencies of those who seek federal office. *Id.*, at 81. As a result, the burden of disclosing independent expenditures generally is "a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view." *Id.*, at 82.

In my view, the significant burden on MCFL in this case comes not from the disclosure requirements that it must satisfy, but from the additional organizational restraints imposed upon it by the Act. As the Court has described *ante*, at 253–255, engaging in campaign speech requires MCFL to assume a more formalized organizational form and significantly reduces or eliminates the sources of funding for groups such as MCFL with few or no "members." These additional requirements do not further the Government's informational interest in campaign disclosure, and, for the reasons given by the Court, cannot be justified by any of the other interests identified by the Federal Election Commission. Although the organizational and solicitation restrictions are not invariably an insurmountable burden on speech, see, *e. g.*, *FEC* v. *National Right to Work Committee*, 459 U. S. 197 (1982), in this case the Government has failed to show that groups such as MCFL pose any danger that would justify infringement of its core political expression. On that basis, I join in the Court's judgment that § 441b is unconstitutional as applied to MCFL.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE WHITE, JUSTICE BLACKMUN, and JUSTICE STEVENS join, concurring in part and dissenting in part.

In *FEC* v. *National Right to Work Committee*, 459 U. S. 197, 209–210 (1982) *(NRWC)*, the Court unanimously endorsed the "legislative judgment that the special characteristics of the corporate structure require particularly careful regulation." I continue to believe that this judgment, as reflected in 2 U. S. C. § 441b, is constitutionally sound and entitled to substantial deference, and therefore dissent from the Court's decision to "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *Id.*, at 210. Though I agree that the expenditures in this case violated the terms of § 441b, and accordingly join Parts I and II of the Court's opinion, I cannot accept the conclusion that the statutory provisions are uncon-

stitutional as applied to appellee Massachusetts Citizens for Life (MCFL).

As the Court recognizes, the segregated fund requirements of § 441b are simply a contemporary chapter in the "long history of regulation of corporate political activity." *Ante*, at 256. See *NRWC, supra,* at 208–209; *United States* v. *Automobile Workers,* 352 U. S. 567, 570–584 (1957). In approving this sort of regulation, our decisions have found at least two legitimate concerns arising from corporate campaign spending. First, § 441b and its predecessors were enacted to rid the political process of the corruption and appearance of corruption that accompany contributions to and expenditures for candidates from corporate funds. See *NRWC, supra,* at 207–208; *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 788, n. 26 (1978); *Automobile Workers, supra,* at 570–575. Second, such regulation serves to protect the interests of individuals who pay money into a corporation or union for purposes other than the support of candidates for public office. See *NRWC, supra,* at 208; *Pipefitters* v. *United States,* 407 U. S. 385, 414–415 (1972); *United States* v. *CIO,* 335 U. S. 106, 113 (1948). In light of the "special advantages that the State confers on the corporate form," *FEC* v. *National Conservative Political Action Committee,* 470 U. S. 480, 495 (1985) *(NCPAC),* we have considered these dangers sufficient to justify restrictions on corporate political activity. See also *California Medical Assn.* v. *FEC,* 453 U. S. 182, 201 (1981).

The Court, rejecting the "teachings of our earlier decisions," *NRWC, supra,* at 210, and the judgment of Congress,[1] confidently concludes that these dangers are not

---

[1] It is, of course, clear that Congress intended § 441b to apply to corporations like MCFL. The section makes it unlawful for *"any corporation . . . to make a contribution or expenditure in connection with"* certain federal elections. 2 U. S. C. § 441b(a) (emphasis added). Other provisions of the statutory scheme make clear that corporations "without capital stock" are within the regulatory sphere. See § 441b(b)(4)(C). This is accordingly

present here. "Groups such as MCFL," the Court assures us, do not pose "the potential for unfair deployment of wealth for political purposes." *Ante,* at 259. Because MCFL was formed to disseminate political ideas, we are told, the money it spends — at least in the form of independent expenditures — reflects the political ideas for which it stands without the threat or appearance of corruption. *Ante,* at 258–260. Nor does the Court find any need to protect the interests of contributors to MCFL by requiring the establishment of a separate segregated fund for its political expenditures. Individual contributors can simply withhold their contributions if they disagree with the corporation's choices; those who continue to give will be protected by requiring notice to them that their money might be used for political purposes. *Ante,* at 261–262.

I do not dispute that the threat from corporate political activity will vary depending on the particular characteristics of a given corporation; it is obvious that large and successful corporations with resources to fund a political war chest constitute a more potent threat to the political process than less successful business corporations or nonprofit corporations. It may also be that those supporting some nonbusiness corporations will identify with the corporations' political views more frequently than the average shareholder of General Motors would support the political activities of that corporation. These distinctions among corporations, however, are "distinctions in degree" that do not amount to "differences in kind." *Buckley* v. *Valeo,* 424 U. S. 1, 30 (1976) *(per curiam).* Cf. *NCPAC, supra,* at 498–499. As such, they are more properly drawn by the Legislature than by the Judiciary. See *Buckley, supra,* at 30. Congress expressed its judgment in § 441b that the threat posed by corporate political activity warrants a prophylactic measure applicable to all

_____

not a case of statutory construction, but rather one in which the Court rejects the judgment of Congress that such regulation is appropriate. Cf. *United States* v. *CIO,* 335 U. S. 106 (1948).

groups that organize in the corporate form. Our previous cases have expressed a reluctance to fine-tune such judgments; I would adhere to that counsel here.

I would have thought the distinctions drawn by the Court today largely foreclosed by our decision in *NRWC, supra.* We considered there the requirement of § 441b(b)(4)(C) that separate segregated funds solicit only from "members." The corporation whose fund was at issue was not unlike MCFL— a nonprofit corporation without capital stock, formed to educate the public on an issue of perceived public significance. See *NRWC,* 459 U. S., at 199–200. We were asked to adopt a broad definition of members because the solicitations involved "would neither corrupt officials nor coerce members of the corporation holding minority political views . . . ." *Id.,* at 206. We had no difficulty concluding that such an approach was unnecessary and that the judgment of Congress to regulate corporate political activity was entitled to "considerable deference." *Id.,* at 209. Most significantly, we declined the invitation to modify the statute to account for the characteristics of different corporations: "While § 441b restricts the solicitation of corporations and labor unions without great resources, as well as those more fortunately situated, we accept Congress' judgment that it is the potential for such influence that demands regulation. Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *Id.,* at 210. We saw no reason why the governmental interest in preventing both actual corruption and the appearance of corruption could not "be accomplished by treating unions, corporations, and similar organizations differently from individuals." *Id.,* at 210–211.

The distinction between corporate and noncorporate activity was not diminished in *NCPAC, supra,* where we found fatally overbroad the $1,000 limitation in 26 U. S. C. § 9012(f) on independent expenditures by "political committees." Our conclusion rested in part on the fact that § 9012(f) regulated

not only corporations but rather "indiscriminately lump[ed] with corporations any 'committee, association or organization.'" *NCPAC*, 470 U. S., at 500. *NCPAC* accordingly continued to recognize what had been, until today, an acceptable distinction, grounded in the judgment of the political branch, between political activity by corporate actors and that by organizations not benefiting from "the corporate shield which the State [has] granted to corporations as a form of *quid pro quo*" for various regulations. *Citizens Against Rent Control* v. *Berkeley*, 454 U. S. 290, 300 (1981) (REHNQUIST, J., concurring).[2]

The Court explains the decisions in *NRWC* and *NCPAC* by reference to another distinction found in our decisions — that between contributions and independent expenditures. See *Buckley, supra*, at 19–23. This is admittedly a distinction between the facts of *NRWC* and those of *NCPAC*, but it does not warrant a different result in view of our longstanding approval of limitations on corporate spending and of the type of regulation involved here. The distinction between contributions and independent expenditures is not a line separating black from white. The statute here — though involving independent expenditures — is not nearly so drastic as the "wholesale restriction of clearly protected conduct" at issue in *NCPAC, supra*, at 501. It regulates instead the *form* of otherwise unregulated spending. A separate segregated fund formed by MCFL may use contributions it receives, without limit, on political expenditures.[3] As the Court cor-

---

[2] Only once have we found unconstitutional a regulation that restricted only corporate political activity. *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978). As we noted in *FEC* v. *National Right to Work Committee*, 459 U. S. 197, 210, n. 7 (1982), our decision in *Bellotti* did not consider the validity of laws, like § 441b, aimed at the threat of corruption in *candidate elections*. See *Bellotti, supra*, at 788, n. 26.

[3] Because the corporation itself may use its own treasury money to pay the fund's administrative costs and to solicit contributions to the fund, 2 U. S. C. § 441b(b)(4), every dollar of those contributions is available for political purposes.

rectly notes, the regulation of § 441b is not without burdens, but it remains wholly different in character from that which we condemned in *NCPAC*. In these circumstances, I would defer to the congressional judgment that corporations are a distinct category with respect to which this sort of regulation is constitutionally permissible.[4]

The basically legislative character of the Court's decision is dramatically illustrated by its effort to carve out a constitutional niche for "[g]roups such as MCFL." *Ante*, at 259. The three-part test gratuitously announced in today's dicta, *ante*, at 263–264, adds to a well-defined prohibition a vague and barely adumbrated exception certain to result in confusion and costly litigation. If we sat as a council of revision to modify legislative judgments, I would hesitate to join the Court's effort because of this fact alone. But we do not sit in that capacity; we are obliged to leave the drawing of lines in cases such as this to Congress if those lines are within constitutional bounds. Believing that the Act of Congress in question here passes this test, I dissent from the Court's contrary conclusion.

JUSTICE WHITE, while joining THE CHIEF JUSTICE's opinion, adheres to his dissenting views expressed in *Buckley* v. *Valeo*, 424 U. S. 1 (1976), *First National Bank* v. *Bellotti*, 435 U. S. 765 (1978), and *FEC* v. *National Conservative Political Action Committee*, 470 U. S. 480 (1985).

---

[4] The statutory scheme at issue in this case does not require us to consider the validity of a direct and absolute limitation on independent expenditures by corporations.