**FEDERAL ELECTION COMMISSION,**
Plaintiff,

v.

**NRA POLITICAL VICTORY FUND,**
et al., Defendants.

Civ. A. No. 90–3090.

United States District Court,
District of Columbia.

Nov. 15, 1991.

Lawrence M. Noble, Gen. Counsel, Richard B. Bader, Assoc. Gen. Counsel, V. Colleen Miller, Atty., Federal Election Com'n, Washington, D.C., for plaintiff.

Charles J. Cooper, Michael A. Carvin, Robert J. Cynkar, Elisabeth T. Roth, Shaw Pittman Potts & Trowbridge, Washington, D.C., for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

The plaintiff filed this suit on December 20, 1990 seeking a declaration that defendants had violated the federal campaign finance laws and an assessment of civil penalties against the defendants. Defendants answered and denied that there had been any violation. Cross motions for summary judgment were filed several months later, and oral argument was heard on September 20, 1991. No genuine issue of material fact remains in dispute, therefore this case is appropriate for summary judgment.

## I. *The Disputed Transaction*

There are three defendants in this suit: the National Rifle Association—Institute for Legislative Action, the NRA Political Victory Fund, and Grant Wills, Treasurer of the NRA Political Victory Fund. The National Rifle Association—Institute for Legislative Action (hereinafter "ILA") is a component of one overall organization, the National Rifle Association. The ILA is not separately incorporated from the NRA but it does have its own separate bank accounts and its own fund-raising system. The NRA Political Victory Fund (herein-after "PVF") is a separate corporate entity. It is a segregated fund, meeting the qualifications of 2 U.S.C. § 441b(b)(2)(C).

The Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431–455, prohibits corporations from contributing to campaigns or making campaign-related expenditures. *See* 2 U.S.C. § 441b(a). This prohibition encompasses contributions made by a corporation to a segregated fund established for the purpose of supporting political campaigns. However, corporations are allowed to pay for the costs of soliciting contributions to a segregated fund either by paying directly or by later reimbursing the fund. 2 U.S.C. § 441b(b)(2)(C); 11 C.F.R. § 114.5(b). If the segregated fund pays the solicitation expenses initially and is later reimbursed by the corporation, reimbursement must occur "no later than thirty calendar days after the expense was paid by the separate segregated fund." 11 C.F.R. § 114.5(b)(3).

The transaction which gave rise to the dispute in this case went as follows. The ILA dispatched two mailings to raise money for the PVF, one in March of 1988 and one in July of 1988. The ILA spent a total of $415,744.72 on these mailings. This payment was entirely legal since corporations may pay for the solicitation expenses of the segregated fund. Then on August 1, 1988, the PVF reimbursed the ILA for its expenditures, remitting to it exactly $415,-744.72. This payment was also legally permissible since a segregated fund can pay for its own solicitation expenses. Then on October 20, 1988, the ILA gave the exact same amount, $415,744.72, back to the PVF. The October 20 payment is the object of the controversy in this case.

The defendants claim that the October 20 payment was a legally permissible reimbursement of solicitation expenses to the PVF. The FEC disagrees and claims that the October 20 payment is not a reimbursement but a direct corporate contribution. The FEC argues that the payment cannot qualify as a permissible reimbursement because it was made 81 days after the PVF outlay which it was supposedly reimbursing.

The defendants also argue that if the October 20 payment is deemed a contribution, it was nonetheless legally permissible under the rule of *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (hereinafter "MCFL"). In *MCFL* the Supreme Court held that it was an unconstitutional restriction on First Amendment rights to prohibit a nonprofit organization that received no contributions from corporations or labor unions from producing a pre-election newsletter that flagged candidates' views on abortion. The Court noted that restrictions on corporate independent expenditures were intended to prevent the wealth amassed for business purposes in corporate treasuries from being spent contrary to shareholder interests or being used to unduly influence elections. In the Court's view, that risk did not arise in the particular arrangement MCFL had.

The FEC rejects the application of the *MCFL* decision to the ILA, claiming that the holding of *MCFL* is limited to a small class of independent expenditures and does not apply to the contribution made in this case.

The Court will now proceed to address these arguments.

## II. *The Violation*

■ To begin, the Court finds that the October 20 payment from the ILA to the PVF violated the FECA. First of all, it does not qualify as a reimbursement for solicitation expenses. Although defendants claim that they simply changed their minds and for fiscal reasons wanted to have the ILA bear the cost of the solicitation as it originally had,[1] the motivation for making the payment does not render it lawful. There must be a time at which a transaction is closed. Defendants cannot be allowed to keep their books open forever so that they can transfer funds between the two entities at will. The FEC has promulgated regulations through the ap-

propriate notice and comment rulemaking procedure which set a 30–day time limit on reimbursements for solicitation expenses. *See* 11 C.F.R. § 114.5(b)(3). The regulations provide a reasonable window of time for transferring funds in the event that there has been an accounting error or that the decision is made to shift the burden of solicitation expenses. There is no legal basis for ignoring or overturning this regulation. Hence, as a matter of law, the October 20 payment to the PVF from the ILA cannot qualify as a reimbursement for solicitation expenses under 2 U.S.C. § 441b(b)(2)C).

■ Moving now to defendants' second argument, the Court finds that the October 20 payment was a contribution and was not of the kind permitted under *MCFL*. *MCFL* permits some nonprofit corporations to make independent expenditures in connection with federal election campaigns where there is no risk that sizeable corporate treasuries will be used to unduly influence elections. Massachusetts Citizens for Life had a policy of not accepting contributions from business corporations or labor unions. Defendants here say in their pleadings that although the amounts are small, the ILA does receive corporate contributions. Nowhere do defendants state a policy equivalent to that of MCFL. Hence the defendants do not fit in the group of organizations affected by the *MCFL* holding, a group which the Court acknowledged at the time of its decision would be "small." 479 U.S. at 264, 107 S.Ct. at 631.

Much as defendants struggle to characterize the October 20 payment as actually paying for solicitation material purchased in March and July, that's not where the money went. The ILA made a contribution to the PVF intended to bolster the PVF's accounts for its campaign-related activities in support of particular candidates. By defendants' own account at argument, the October 20 payment returned money to PVF originally taken from PVF to correct for inaccurate financial projections so that

---

**1.** Defendants state that some time after August 1 they realized that the PVF needed more funds than they had projected at the time the PVF

reimbursed the ILA for the solicitation expenses. Hence, they caused the October 20 payment to be made. *See* Wills Affidavit, ¶ 28.

PVF would have an adequate budget to pay for its substantive campaign-related activities. The money used to pay for the solicitation materials was paid by ILA back in March and July, 1988.

The Court finds that the October 20 payment was not a reimbursement of solicitation expenses and was instead an illegal contribution in violation of the FECA.

### III. The Constitutional Status of the FEC

In their motion for summary judgment, defendants have also made the argument that the Federal Election Commission is unconstitutional. They claim the statutory scheme for appointing Commissioners infringes on the presidential appointment power granted in the Constitution because the President is prevented from appointing more than three Commissioners from the same political party. They further claim that because the Commissioners cannot be controlled or removed by the President, execution of the laws is being entrusted to someone other than the President, who under Article II is to have the sole executive power. Finally, they claim there is a violation of separation of powers because the Secretary of the Senate and the Clerk of the House sit on the Federal Election Commission as non-voting ex officio members.

■ Defendants have read the Constitution correctly. Article II gives the President alone the power to appoint officers of the United States and the power to execute the laws. It follows, therefore, that it is the President and not the NRA who can challenge alleged infringements of presidential powers because only the President's interests are affected. Plaintiffs bringing suit must, at a minimum, allege facts that show a personal stake in the outcome of the question posed. See Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.") Moreover, the Court also said that a plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties." 422 U.S. at 499, 95 S.Ct. at 2205. See also Linda R.S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (No standing to raise claim where relief sought by plaintiff is too attenuated from basis of claim).

■ The same principles apply to the defendants in this case. Any attempt to show that defendants' interests have been harmed by the statutory appointment scheme for the FEC would be speculative at best.[2] And ultimately, defendants have raised an issue that bears on the rights of a third party, namely the President, and not on their own legal interests. Similarly, any claim that the presence of non-voting ex officio members of the FEC has harmed defendants' interests is equally speculative.

---

2. The Court notes that many so-called "independent agencies" operate under a scheme very similar to that governing the FEC. These agencies, including the Securities and Exchange Commission, the Interstate Commerce Commission, and the Federal Trade Commission, are sometimes called the "fourth branch of government." They have functioned admirably for decades. Indeed the Interstate Commerce Commission is over 100 years old, the FTC 75, and the SEC over 50. See generally, B. Schwartz, Administrative Law 7–11 (1988). There must be a presumption of regularity where organizations have performed their missions for many years.

Other courts have rejected arguments like the one set forth by defendants. For example, the Ninth Circuit not long ago upheld the constitutionality of the Federal Trade Commission. See FTC v. American National Cellular Inc., 810 F.2d 1511 (9th Cir.1987). The Court stated in its opinion that officers of the United States who are appointed by the President but only removable by impeachment may enforce federal law. Id. at 1514.

Similarly, in Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), the Supreme Court upheld the statutory scheme creating the Sentencing Commission. Under that statute, the President is even further restricted in his appointment authority: he must appoint at least three federal judges to the Commission, and he must first consider a list of judges recommended by the Judicial Conference. As there are far fewer federal judges than there are members of any political party in this country, this requirement places a far tighter constraint on the presidential appointment power than the party restrictions that apply to the Federal Election Commission.

There has been no allegation that either the Secretary of the Senate or the Clerk of the House influenced the outcome of FEC decisionmaking.

██ Indeed, defendants have not alleged that the Secretary and the Clerk were even present for or participated in the proceedings in question. They serve as non-voting members and as such have no real say in the outcome of any Commission proceedings. To declare the FEC unconstitutional because the statute allows certain individuals to sit as nonvoting members of the Commission would be an excessive remedy for what is only an alleged and insubstantial infringement. At best, if defendants are correct in their assessment of the Constitution, the appropriate remedy for the problem would be to bar the Secretary and the Clerk from attending Commission meetings. Since there has been no showing that these nonvoting members had any involvement in the decisions made in connection with this action, there is no need for the Court to concern itself with this separation of powers argument.

## IV. Assessment of Penalties and Injunctive Relief

██ Although the parties in this case have requested further oral argument on the issue of penalties, the Court believes that it has all the relevant information it needs to decide this issue. Plaintiffs are seeking one penalty from the PVF and Grant Wills and one from the ILA, each in the amount of the October 20 payment that constituted the violation. That amount is $415,744.72. The statute, 2 U.S.C. § 437g(a)(6)(A), allows the Court to assess a penalty no greater than the amount implicated in the violation, but it does not require that the Court select any particular amount.

To anyone reviewing the October 20 payment, it was obvious that the October 20 payment was not legally permissible. The defendants constructed a legal argument in an attempt to defend their actions, but that argument elevates form far above substance and holds no weight with this Court. Defendants could have achieved the end

result of all these transactions in a legally permissible manner had they used better financial planning and realized that the PVF would ultimately need the money. Therefore, the Court does not find that defendants have engaged in the kind of impermissible conduct that would require the assessment of a penalty for the full $415,744.72. Such a penalty would simply not be proportional to the violative conduct. Moreover, the record does not indicate that the defendants are chronic violators of the campaign finance laws who need stiff punishment.

Nonetheless, the fact remains that the money was spent on campaign-related expenditures in violation of FECA. In recognition of that fact, the Court will assess a penalty against the defendants that will reflect the nature and the effect of the violation as well as the effort expended by the Commission and its staff in enforcing the federal election laws.

Accordingly, the Court will assess a penalty measured by the costs incurred by the FEC in investigating and prosecuting this action. Defendants shall pay the ordinary costs associated with litigation as well as the full amount of attorney's fees and other personnel expenses allocable to this action. Plaintiffs shall have fifteen days to provide the Court with an accounting of the costs involved.

██ Finally, plaintiffs seek an injunction that prohibits defendants from repeating the violation. Defendants maintained the position in open court that they had not violated the federal election laws, and they refused to promise that they would not repeat the transaction implicated here because they wished to maintain flexibility in their bookkeeping. Based on this representation, the Court finds that an injunction is appropriate because it is possible the violation will be repeated. As the Court noted at the hearing, if defendants maintain close scrutiny over their accounts, there should be no need to repeat the violation.