NATIONAL RIGHT TO LIFE PO-
LITICAL ACTION COMMIT-
TEE, et al., Plaintiffs,

v.

Charles G. LAMB, et al., Defendants.

No. 00–04200–CV–C–5.

United States District Court,
W.D. Missouri,
Central Division.

April 9, 2002.

James Bopp, Jr., Terre Haute, IN, Justin David Bristol, Terre Haute, IN, Dewey L. Crepeau, Columbia, MO, Randy Elf, Bopp, Coleson & Bostrom, Terre Haute, IN, for plaintiffs.

Joel E. Anderson, Paul R. Maguffee, Atty. General's Office, Jefferson City, MO, for defendants.

### ORDER

LAUGHREY, District Judge.

Pending before the Court are the parties' cross motions for summary judgment. The parties have agreed that there are no factual issues in dispute and the cross motions can be decided as a matter of law. Having reviewed the record and the arguments of the parties, the Court grants the Defendants' Motion for Summary Judg-

ment, as it relates to Count VII of Plaintiffs' Complaint. Plaintiffs' remaining claims are dismissed because they are not justiciable.

### I. Factual Background

Plaintiff National Right to Life Committee, Inc. ("NRLC") is a national, not-for-profit corporation, which is incorporated in Washington, D.C. NRLC is not associated with any political party or campaign committee, and membership is not based on political party affiliation. *See* Plaintiffs' Complaint at ¶ 5. Plaintiff National Right to Life Political Action Committee ("NRLPAC") is an internal political action committee established by NRLC. *See* Plaintiffs' Complaint at ¶ 6. Plaintiff Amarie Natividad is Treasurer of NRLPAC, and she resides in McLean, Virginia.

NRLC's principal financial resources are derived from donations. *See* Answers to Defendants' First Interrogatories at 6. NRLC occasionally donates money to candidates or candidate committees. [Plaintiffs' Statement of Facts, ¶ 6]. However, making donations to candidates or their committees or expressly advocating the election of identified candidates is not the major purpose of NRLC. *See* Plaintiffs' Complaint at ¶ 15. Such activities are primarily carried out by NRLPAC. *See* Plaintiffs' Complaint at ¶ 20. NRLC does engage in issue advocacy, in part, by distributing voter guides to identify pro-life candidates. [Plaintiffs' Complaint at ¶ 14]. According to NRLC, these voter guides do not contain express advocacy as that term has been defined in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), but are intended to influence voters.

In the weeks leading up to the November 7, 2000, Missouri gubernatorial election, neither NRLC nor NRLPAC intended to make expenditures with respect to any Missouri state election. NRLPAC,

however, had been actively engaged in the United States Senate race in Missouri where NRLPAC had been advocating the defeat of Governor Carnahan and the re-election of Senator Ashcroft. When Governor Carnahan was killed in a plane crash on October 16, 2000, NRLPAC decided to reallocate its resources to make expenditures to expressly advocate the election of Jim Talent or the defeat of Bob Holden for Missouri governor. NRLPAC printed new political communications and intended to distribute these communications beginning October 17, 2000, 21 days prior to the November 7th elections and one day following the death of Governor Carnahan. *See* Plaintiffs' Complaint at ¶ 32 and Exhibit C to Plaintiffs' Motion for Summary Judgment. These communications expressly advocated the election of Jim Talent for Missouri governor and would have cost in excess of $1,500 to print and distribute. *See* Plaintiffs' Complaint at ¶ 26.

Because NRLPAC was shifting gears from a national election to a state election, it contacted the Missouri Ethics Commission (MEC) about its intended independent expenditure.[1] According to NRLPAC, a person at MEC named "Mike" told NRLPAC that "it was not possible for NRLPAC to make any independent expenditures with respect to the Missouri gubernatorial race in November 2000, because of two separate provisions of Missouri law. Mike explained that Missouri law prohibited NRLPAC from making any independent expenditures respecting a Missouri election within thirty (30) days prior to such election." *See* Tobias Affidavit, Exhibit J to Plaintiffs' Suggestions in Opposition to Defendants' Motion for Summary Judgment and in Reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

NRLPAC contends that § 130.049[2] prevented it from making its independent expenditure because it prohibits out-of-state committees from making any independent expenditure within 30 days of a Missouri state election. *See* Plaintiffs' Complaint ¶ 34, and Plaintiffs' Motion for Summary Judgment, Statement of Facts ¶ 10. According to NRLPAC, the other statute which created an obstacle to its intended independent expenditure was § 130.011(10). That statute defines a "continuing committee". "Continuing committees" are analogous to a political action committee at the federal level and are subject to several reporting and registration requirements. [Exhibit D to Plaintiffs' Motion for Summary Judgment]. *Also See* §§ 130.021, 130.031, 130.032, 130.036, 103.041, 130.046, 130.049, 130.050, 130.058, 130.072 and 130.081 (1997). Section 130.011 requires a "continuing committee" to register with the MEC at least 30 days before the election. After reviewing § 130.011(10), NRLPAC concluded that because there were only 21 days left before the election, it could not register with the MEC within 30 days of the election.

After NRLPAC concluded that it could not make an independent expenditure within 30 days of the election, NRLC considered its options. Like NRLPAC, it believed it would be prohibited from making an independent expenditure within 30 days of the election because of § 130.049 and § 130.011(10). Having concluded that

---

1. An independent expenditure is an expenditure for political speech that contains express advocacy, made without candidate coordination or consultation. *See Iowa Right to Life Committee, Inc. v. Williams,* 187 F.3d 963, 968 (8th Cir.1999). Express advocacy is political speech that uses express or explicit terms advocating the election or defeat of clearly identified candidates for public office. *Id.* at 969–70.

2. Unless otherwise noted, all statutory references are to Mo.Rev.Stat.2001.

it could not make an independent expenditure, NRLC decided to change the language of its communication, omitting any explicit terms advocating the election or defeat of candidates in the Missouri gubernatorial race. In other words, NRLC converted the "express advocacy ads" to "issue ads."[3] However, NRLC was still concerned about the application of § 130.011(10) to "issue advocacy." NRLC thought Missouri's definition of a "continuing committee" in § 130.011(10) might not meet the "bright line" test adopted in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In an effort to determine whether Missouri followed a bright line test, NRLC's attorney wrote to Michael Reid, Director of Compliance at MEC. NRLC's lawyer asked Mr. Reid to initial his approval of a specific legal interpretation of Missouri law or to provide an alternative interpretation. [Exhibit F, Suggestions in Support of Plaintiffs' Motion for Summary Judgment]. Plaintiffs' lawyer also gave certain "examples" of the kind of political communications that his clients "usually engage in" and asked Mr. Reid to indicate whether "such communications" would make NRLC subject to regulation as a "continuing committee" under Missouri law or to provide a separate explanation of Missouri law.

Mr. Reid responded as follows:

In response to your faxed letter of October 27, 2000, the Missouri Ethics Commission has not given a "bright line" on expressed advocacy dealing with political advertisements and speech. The Commission determines on a case by case basis whether or not advertisements or speech urges voters to vote for or against an issue or a candidate. Your asking for my opinion on whether or not certain statements are a political advocacy cannot be answered. A statement taken out of context cannot be judged. It would be inappropriate for me to make any qualified statements concerning your communications. [Exhibit G, Plaintiffs' Suggestions in Support of Plaintiffs' Motion for Summary Judgment].

The MEC authorizes issuance of opinions only pursuant to its authority under § 105.955.16, and makes decisions to issue opinions only by affirmative vote of four members taken in official meeting. § 105.955.6. The Commission has not delegated or attempted to delegate any authority to issue opinions to any member of its staff, including the Director of Compliance. Lamb Affidavit, ¶ 5, Exhibit 1 to Defendants' Motion for Summary Judgment. In the past, when "continuing committees" have violated the deadlines set by § 130.011(10) by failing to file a statement of organization 30 days before an election, the MEC has entered agreements with treasurers of those committees for the payment of fees pursuant to MEC's au-

---

**3.** Issue ads do not contain express terms advocating the election or defeat of a clearly identified candidate. *Iowa Right to Life Committee v. Williams*, 187 F.3d 963, 967–70 (8th Cir.1999). The record does not include a copy of the "issue ads" that NRLC planned to distribute. In a letter from Plaintiffs' lawyer to Mike Reid on October 27, 2000, the lawyer gave the following example of the kinds of political communications that his clients usually engage in:

Bob Holden is running for Governor of the State of Missouri.

Bob Holden believes that a woman's right to choose should always prevail over an unborn child's right to life.

Let Bob Holden know that Missouri needs leaders who will protect the rights of unborn children. [Exhibit F, Plaintiffs' Suggestions in Support of Plaintiffs' Motion for Summary Judgment].

The letter does not state that this is the ad that NRLC intended to use; nor is it like Exhibit C, Plaintiffs' Suggestions in Support of Plaintiffs' Motion for Summary Judgment, which is clearly a copy of campaign literature.

thority under § 105.961.4(6). Lamb Affidavit, ¶ 13, Exhibit 1 to Defendants' Motion for Summary Judgment. At no time prior to this lawsuit, or since, has NRLC or NRLPAC sought an interpretation of the Missouri Election Law from the MEC pursuant to § 105.955.16, nor did they seek a temporary restraining order or take any other legal actions until the day of the election, November 7, 2000.

On the day of the 2000 election, NRLPAC and NRLC filed this suit challenging the constitutionality of an array of Missouri campaign finance laws. They seek to have these statutes struck down as facially unconstitutional, or alternatively, as applied to them. They seek a declaratory judgment to that effect and permanent injunctive relief. *See* Plaintiffs' Complaint VI. Request for Relief.

## II. Plaintiffs' Claims

Count One. NRLPAC and NRLC request the Court to find unconstitutional the requirement of § 130.011(10), that a "continuing committee" must register and file a disclosure report with the MEC at least 30 days prior to an election.

Count Two. NRLPAC and NRLC request the Court to find unconstitutional the requirement of § 130.049, that an "out-of-state committee" is precluded from making expenditures for communications with respect to Missouri elections within 30 days prior to such elections.

Count Three. NRLC and NRLPAC request the Court to find unconstitutional § 130.049, that an "out-of-state committee" is precluded from making expenditures for communications with respect to Missouri state elections within fourteen days after it has filed disclosure reports with the MEC.

Count Four. NRLPAC and NRLC request the Court to find that § 130.049 violates Article IV, Section 2, Privileges and Immunity Clause of the United States Constitution, because the same legal privileges and immunities available to Missouri "continuing committees" are not available to "out-of-state committees".

Count Five. NRLC requests the Court to find unconstitutional the application of Missouri "PAC" regulations to organizations that do not have the major purpose of making contributions to candidates and/or making contributions for communications expressly advocating the election or defeat of clearly identified candidates for public office. According to the Plaintiffs, the statutes which would be affected by such a finding are §§ 130.011(10), 130.021, 130.031, 130.032, 130.036, 130.041, 130.046, 130.049, 130.050, 130.058, 130.072 and 130.081.

Count Six. NRLC requests the Court to find that § 130.011(10) is unconstitutional because it regulates "issue advocacy". The Plaintiffs also ask that §§ 130.011(7), 130.011(12) and 130.011(16) be struck down because they work in conjunction with § 130.011(10). Plaintiffs' Suggestions in Support of Motion for Summary Judgment n. 21, p. 34.

Count Seven. NRLPAC and NRLC request the Court to find unconstitutional the requirement in § 130.021(10) that an "out-of-state committee" must appoint a Missouri resident as treasurer if it intends to make expenditures in excess of $1,500, with respect to a Missouri state election.

## I. Discussion

To determine the justiciability of Plaintiffs' claims, the Court considers them from two perspectives, the past and future. This is because the Plaintiffs have sought relief based on a sequence of events surrounding the 2000 election, but also claim that they intend to participate in future Missouri state elections *ad infinitum* and are concerned about how these statutes might be applied to them in the future. The Court also considers each claim independently. *See Powell v. McCormack*, 395

U.S. 486, 497, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

### A. Past Injury

#### 1. Standing—Counts Two, Three and Four

In Count Two of Plaintiffs' Complaint, NRLPAC and NRLC request the Court to declare unconstitutional and enjoin § 130.049, which precludes "an out-of-state committee" from making any expenditures for communications in Missouri elections within 30 days prior to such elections. In Count Three, Plaintiffs seek an order that § 130.049 is also unconstitutional because it precludes "out-of-state committees" from making expenditures for communications with respect to Missouri state elections within 14 days after it has filed disclosure reports with the MEC. In Count Four, NRLPAC and NRLC request the Court to find that § 130.049 violates Article IV, Section 2, Privileges and Immunity Clause of the United States Constitution, because the same legal privileges and immunities available to Missouri "continuing committees" are not available to "out-of-state committees." Plaintiffs lack standing to pursue any one of these claims.

■ To establish standing, a plaintiff must prove (1) injury in fact; (2) adequate causation; and (3) a likelihood of redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119

L.Ed.2d 351 (1992). There must be a concrete and particularized injury to the interest of the specific plaintiff before standing is permitted. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 120 S.Ct. 693, 703–04, 145 L.Ed.2d 610 (2000). At the very least, the doctrine of constitutional standing requires the party who invokes the Court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury " 'fairly can be traced to the challenged action' " and " 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)).

■ Section 130.021.10 requires an out-of-state committee to file a statement of organization if its contributions and expenditures in Missouri exceed $1,500 in a calendar year or if contributions from Missourians exceed 20% of the committee's total contributions received in the preceding 12 months.[4] Thus, NRLPAC would be subject to §§ 130.049 and 130.050 only if its contributions and expenditures in Missouri total $1,500, or less, in a calendar year.[5] If its contributions and expendi-

---

4. Section 130.021(10) states in pertinent part:
10. A committee domiciled outside this state shall be required to file a statement of organization and appoint a treasurer residing in this state and open an account in a depository within this state; provided that either of the following conditions prevails:
 (1) ....
 (2) The aggregate of all contributions and expenditures made to support or oppose candidates and ballot measures in this state exceeds one thousand five hundred dollars in the current calendar year.

5. Section 130.049 states in pertinent part:

An out-of-state committee *which according to the provisions of subsection 10 of section 130.021 is not required to file a statement of organization and is not required to file the full disclosure reports required by section 130.041* shall file reports with the Missouri Ethics Commission according to the provisions of such statutes if the committee makes...expenditures...in any election covered by this Chapter....The expenditures shall be made no later than thirty days prior to the election. (Emphasis added). The state contends that the statute relieves an out-of-state committee (i.e., a committee

tures were to exceed that level, NRLPAC would be required to file a statement of organization in Missouri pursuant to § 130.011.10, and would be outside the scope of §§ 130.049 and 103.050.[6] NRLPAC has not alleged that it would have or will make contributions or expenditures in Missouri totaling $1,500, or less; rather the particular expenditures identified by NRLPAC would have exceeded $1,500, and would not have exposed NRLPAC to liability under §§ 130.049 and 130.050. [Plaintiffs' Suggestions at 4; Complaint ¶¶ 26, 79–81]. If Plaintiffs cannot personally show "some actual or threatened injury" caused by these particular provisions, then they do not have "standing to challenge them." *Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. 752.

Plaintiffs contend that Exhibit D to Plaintiffs' Motion for Summary Judgment demonstrates that the requirements of §§ 130.049 and 130.050 are in fact applied to out-of-state committees that spend more than $1,500 in Missouri. According to Plaintiffs, Exhibit D is a MEC complaint against several organizations which allegedly spent in excess of $1,500 in a Missouri election. The exhibit states: " . . . [T]hese organizations appear to show that they were organized in order to promote a specific position concerning various issues including campaign finance reform. It would appear that these organizations would fall within the definition of a com-

mittee and therefore were required to file as committees under §§ 130.049 and 130.050." In support of their position that §§ 130.049 and 130.050 apply to all out-of-state committees, even those that spend more than $1,500, Plaintiffs also point to a summary guide prepared by the MEC concerning out-of-state committees [Exhibit K, Plaintiffs' Motion for Summary Judgment] which states:

Out–of–State Committees

1. No contribution or expenditure may be made within 30 days of the date of the election.

First, and most importantly, any reasonable reading of § 130.021(10) makes it clear that §§ 130.049 and 130.050 don't apply when expenditures are in excess of $1,500. Second, Exhibit D is not a finding by the MEC, but merely a decision by the Commission to refer the complaint for investigation. Furthermore, the complaint has to do with reporting requirements, not the 30 day expenditure issue. If, as Plaintiffs argue, § 130.021(10) only deals with reporting requirements contained in §§ 130.049 and 130.050, and not the 30 day limit, it would make no sense, even under Plaintiffs' interpretation, for the Commission to suggest that a group that spent more than $1,500 was subject to the reporting requirements of §§ 130.049 and 130.050.

Finally, when "Mike" implied that there were two statutes that had 30 day limits, he most plausibly was referring to §§ 130.049 and 130.011.[7] Those are the

---

that spends under $1,500 and is not domiciled in Missouri) from the burden of PAC regulation. Those expenditures, however, must be reported.

6. According to both the NRLC and the Defendants, NRLC would not be subject to § 130.011(10), either because of the constitution or because of the statutory exemption in § 130.011(7)(c). If NRLC is not a committee under § 130.011(7), then it is not subject to §§ 130.049, 130.050 or 130.011(10), because these statutes apply only to "Committees."

7. There is nothing in the record to show what two statutes "Mike" was referring to when NRLPAC telephoned the MEC on October 17, 2001. That phone call is referred to in Plaintiffs' Statement of Facts ¶ 10, as follows:

The MEC informed NRLPAC that it could not make the independent expenditure because of the Disclosure Law prohibition on independent expenditures by out-of-state political committees within 30 days prior to a state election. Plaintiffs' Verified Complaint at ¶ 34, *see also*, Exhibit K and RSMo 130.049 and 130.050.

only two statutes that contain 30 day limits and are the ones that Plaintiffs seek to strike down because of the 30 day limits. If the 30 day speech blackout in § 130.049 applies to all out-of-state committees, including those that spend in excess of $1,500, it would have been unnecessary for "Mike" to reference two statutes—130.049 and 130.011.

The Court concludes that "out-of-state committee," as used in §§ 130.049 and 130.050, is a statutory term that includes only "committees" that spend less than $1,500 in a Missouri election and are not domiciled in Missouri. The Court acknowledges that Exhibit K, A Guide for Out–of–State Committees and Federal Committees, does not make this clear. The guide, however, cannot change the law and, in fact, there is such a disclaimer at the beginning of the guide. Moreover, the term "out-of-state committee" in that guide should be read consistently with the statute to mean a "committee" not domiciled in Missouri that spends less than $1,500. Accordingly, Plaintiffs lack standing to attack the constitutionality of § 130.049 and § 130.050, and lack standing to pursue its claims in Count Three, which is a privileges and immunity challenge based upon §§ 130.049 and 130.050.

**2. Mootness—Counts One, Five, Six and Seven**

■ In *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), the Supreme Court explained that the mootness doctrine is a product of the Constitution's case-or-controversy limitation on federal judicial authority. *Id.* at 703–04. "Simply stated, a case is moot

when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Doe v. La-Fleur*, 179 F.3d 613, 615 (8th Cir.1999). "The case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990); *In re Rodriquez*, 258 F.3d 757, 759 (8th Cir. 2001).

■ A case, however, will not be moot if one of the following four exceptions apply; "(1) secondary or 'collateral' injuries survive after resolution of the primary injury; (2) the issue is deemed a wrong capable of repetition yet evading review; (3) the defendant voluntarily ceases an allegedly illegal practice but is free to resume it at any time; or (4) it is a properly certified class action suit." *Hohn v. United States*, 262 F.3d 811 (8th Cir.2001). The burden to prove mootness is on the parties seeking to invoke the doctrine and is a heavy one. *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); *Young v. Hayes*, 218 F.3d 850, 852 (8th Cir.2000).

■ The 2000 election is past. Because Plaintiffs did not file this suit until the actual day of the election, there was no meaningful possibility of relief for any injury it sustained in the 2000 election cycle. In *Renne v. Geary*, 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991), the Supreme Court warned: "[w]hile the mootness exception for disputes capable of repetition yet evading review has been applied in the

---

Exhibit K and ¶ 34 of the Complaint deal only with out-of-state committees regulated under §§ 130.049 and 130.050, but § 130.050 does not contain any reference to a 30 day deadline. A 30 day deadline is found in only two

statutes applicable to this case, §§ 130.049 and 130.011(10). These are also the two statutes which Plaintiffs seek to declare unconstitutional because of 30 day limits.

election context, that doctrine will not revive a dispute which became moot before the action commenced." *Id.* at 320, 111 S.Ct. 2331.

As a practical matter, this matter was moot on the day the Complaint was filed, which was the day of the election. Because no temporary restraining order (TRO) was filed, it did not even come to the attention of the Court until weeks after the 2000 election. Filing suit on the day of an election was at best an attempt to comply in form with the Supreme Court's admonition in *Renne v. Geary.* It did not comply with the substance of the mootness doctrine.[8] "A basic principle of standing is that a person is not entitled to litigate in a federal court unless he can show a reasonable probability of obtaining a tangible benefit from winning. Certainty is not required but a remote possibility won't do." *Diaz v. Duckworth,* 143 F.3d 345, 347 (7th Cir.1998). There was no possibility of redressing Plaintiffs' claimed injury when suit was filed.

 The Plaintiffs argue, however, that there is an exception to the mootness doctrine that applies to this situation because the wrong done to them is "capable of repetition, yet evading review, ...." *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). This exception applies where "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the *same complaining party* would be subjected to the same ac-

tion again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (emphasis added). It is enough if the Plaintiffs can demonstrate a substantial likelihood that they will again suffer the harm alleged. *Honig v. Doe,* 484 U.S. 305, 318, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). "The capable of repetition, yet evading review rule is an extraordinary and narrow exception to the mootness doctrine." *Randolph v. Rodgers,* 170 F.3d 850, 856 n. 7 (8th Cir.1999). The burden to establish the exception is on the party asserting jurisdiction. *Spencer v. Kemna,* 523 U.S. 1, 17–18, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).

Given the uniqueness of the circumstances surrounding the 2000 election in Missouri, any similar dispute between the parties is highly unlikely to recur.[9] While a national candidate in Missouri might theoretically die again within 30 days of an election, the chance of NRLC being involved in that contested national race and then deciding to become involved in a state election is tenuous at best. There is simply "no reasonable expectation that the same complaining party will be subjected to the same action again." *Weinstein,* 423 U.S. at 149, 96 S.Ct. 347. For examples of cases where the Eighth Circuit has found mootness or concluded that the "capable of repetition" exception does not apply in analogous situations, see: *Missouri ex rel. Nixon v. Craig,* 163 F.3d 482 (8th Cir. 1998); *Minnesota Humane Society v. Clark,* 184 F.3d 795 (8th Cir.1999); *Midwest Farmworker Employment and Training, Inc. v. United States Depart-*

---

**8.** In the context of these facts, the line between standing and mootness is unclear. Mootness is standing "set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)". Henry Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale

L.J. 1363, 1384 (1973). As a practical matter, Plaintiffs' injuries were not redressable when the lawsuit was filed, so they arguably lack standing.

**9.** The record does not show that such an untimely death has occurred in the past or since.

*ment of Labor,* 200 F.3d 1198 (8th Cir. 2000).

While the Plaintiffs have alleged that they intend to participate in Missouri elections in the future, they have not suggested that they intend to wait until 30 days before the election to register as a continuing committee, nor would it make sense for them to intentionally limit their activities to the 30 days before the election. Therefore, as to Count One, Plaintiffs' challenge to the 30 day time limit in § 130.011(10), there is no substantial likelihood that Plaintiffs will again suffer the harm that they are alleged to have suffered in the past. As to Plaintiffs' remaining constitutional challenges, Counts Five, Six and Seven, they can be addressed during a normal election cycle. Thus, any wrong allegedly caused by the statutes referred to in Counts Five, Six and Seven may be capable of repetition but will not evade review.

*Van Bergen v. State of Minnesota,* 59 F.3d 1541 (8th Cir.1995), a case cited by Plaintiffs to show that their case is not moot, is distinguishable. In *Van Bergen v. State of Minnesota,* 59 F.3d 1541 (8th Cir. 1995), the Eighth Circuit found that a candidate for governor could challenge on appeal a state statute that prohibited automatic dialing announcing devices ("ADAD"), even though the election had passed before the matter was heard on appeal. The Eighth Circuit found that the issue was not moot, stating "[e]lection issues are among those most frequently saved from mootness by this [capable of repetition, yet evading review] exception." *Id.* at 1547.

Van Bergen, however, had sought a TRO in federal court before the primary election and before the challenged statute went into effect. Prior to bringing suit, Van Bergen had been told by the Attorney General's Office that the statute would be enforced against him if he used an ADAD

for political speech. According to NRLPAC, it was told on October 17, that it could not make an independent expenditure in the governor's race. Yet, in contrast to Van Bergen, NRLPAC did not bring suit in federal court until the day of the election, 21 days after being first informed that its participation in the Missouri elections was limited by government regulation. Even then, it did not ask for a TRO. *Van Bergen* is distinguishable because Van Bergen had done what was necessary and reasonable to address a legally cognizable threat to a First Amendment right. The threat had been promptly addressed in the district court but the appeal could not be brought until after the election. By waiting until the day of the election, the Plaintiffs eliminated any reasonable possibility that their past injuries could be redressed. To now complain that the mootness doctrine should be waived because the wrong done to them might evade review in the future, turns the exception on its head. The exception is a safety valve when no reasonable alternatives are available. If a party fails to take advantage of remedies that are available, they should not be permitted to later circumvent the case and controversy requirement of Article III. "When a party has ... legal avenues available, but does not utilize them, the action is not one that evades review." *Minnesota Humane Society,* 184 F.3d at 797 (8th Cir.1999).

Second, the Court in *Van Bergen* recognized that because of Van Bergen's past involvement in political campaigns in Minnesota, there was a reasonable likelihood that Van Bergen would participate in future state elections and attempt to spread his political views in the state using an ADAD. Unlike *Van Bergen,* there is no evidence in the record that either NRLPAC or NRLC has participated in Missouri state elections before. As national organizations, they have participated in

national elections in Missouri; *i.e.* Senate and Presidential campaigns, but there is no evidence they have previously participated in a Missouri state election. Finally, the Attorney General of Minnesota had told Van Bergen that he could not use the ADAD for political speech. Except for the statement by "Mike" that NRLPAC could not make an independent expenditure in the last 30 days of the election cycle, no state official has told NRLPAC or NRLC that the array of statutes which they are seeking to strike down will be applied to them.

*Douglas v. Brownell*, 88 F.3d 1511 (8th Cir.1996), is also distinguishable. In that case, the district judge found the plaintiff's dispute concerning a residential picketing ordinance was moot because the doctor who was the target of a group of abortion protestors had left town. The Eighth Circuit reversed finding that there was a live case or controversy because the ordinance in question limited picketing in front of any residence and the abortion protestors had indicated that they wished to picket in front of the plaintiff's residence as well as others. There was nothing in the record in *Douglas,* however, to show that it was unlikely that the problem would recur. It is highly theoretical that there will be a future dispute involving the Plaintiffs and the 30 day limits in the Missouri statute.

The Court understands the challenges that the Plaintiffs faced in the waning days of the 2000 election cycle. On the other hand, Plaintiffs had available state and federal courts to immediately address any threat to their First Amendment rights. Judicial intervention at that time would have been focused and productive. Now it would be unfocused and academic. Neither the parties nor the Court can change what happened in the past, and the resources of the Court are best preserved for live controversies with parameters made clear by the concrete actions of the parties. Even in the context of elections and even when First Amendment rights are involved, Article III of the Constitution must be given some meaning.

**B. Future Injury**

 Article III courts are barred by the case or controversy requirement from deciding "abstract, hypothetical or contingent questions, ...." *Alabama State Fed'n of Labor, Local Union No. 103, United Bhd. of Carpenters and Joiners of America v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945). Closely related to the case or controversy requirement is the ripeness doctrine.

 "[R]ipeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). 13 C.A. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D, § 3532 (2nd ed.1995 and 1998 Supp.). The question of ripeness turns on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by California v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

 When deciding whether a dispute is ripe, the Court should consider "(1) whether delayed review would cause hardship to the plaintiff; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether courts would benefit from further factual development of issues presented." *Ohio Forestry Association, Inc. v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). The jurisprudential component of ripeness ensures

that a court does not prematurely address an issue that may become more concrete and focused at a subsequent time. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)). Why are most of NLRPAC's and NRLC's claims premature? To answer this question, it is necessary to review the actual claims that NRLPAC and NRLC have raised.

### 1. Count One—30 day Registration Requirement— § 130.011(10)

In Count One, both plaintiffs claim that it is unconstitutional for Missouri to require a "continuing committee" to register and file disclosure reports at least 30 days before an election. This requirement is found in § 130.011(10).[10] For Plaintiffs to face a credible threat of enforcement of this section, Plaintiffs would need to decide to become involved in a Missouri state election within 30 days of the election. Plaintiffs are national organizations that only became interested in a Missouri state election after the national senatorial election was disrupted by the death of Governor Carnahan. Plaintiffs have presented no evidence that they previously partici-

pated in any Missouri state election with either express or issue advocacy. Yet, the Plaintiffs state that they intend to participate in various ways in Missouri elections "*ad infinitum*". [Plaintiffs' Verified Complaint ¶¶ 79, 80 and 81]. They do not say, nor could they reasonably say, that they intend to wait until 30 days before an election to decide how they want to participate. It would be more than a little stretch to conclude that Plaintiffs risk a future credible threat of an enforcement action that would raise the constitutionality of the 30 day registration requirement in § 130.011(10). It would be inconsistent for an organization committed to participating *ad infinitum* in Missouri state elections to delay its registration until 30 days before the election.

Nor is it clear how the State of Missouri would respond to a "continuing committee" which failed to register before the 30 day cutoff. While Plaintiffs claim that they were told by an unidentified "Mike" at the MEC that they were not permitted to make any contribution within 30 days of the election, there is ambiguity in the record about which statutes "Mike" was referring to. If "Mike" was referring to §§ 130.011(10) and 130.049, which seems the most likely conclusion, the Defendant Charles Lamb, President of MEC, has filed an affidavit which contradicts "Mike's" statement. Lamb says:

10. **130.011(10). "Continuing committee"**, a "committee of continuing existence which is not formed, controlled or directed by a candidate, and is a committee other than a candidate committee or campaign committee, whose primary or incidental purpose is to receive contributions or make expenditures to influence or attempt to influence the action of voters whether or not a particular candidate or candidates or a particular ballot measure or measures to be supported or opposed has been determined at the time the committee is required to file any statement or report pursuant to the provisions of this chapter. 'Con-

tinuing committee' includes, but is not limited to, any committee organized or sponsored by a business entity, a labor organization, a professional association, a trade or business association, a club or other organization and whose primary purpose is to solicit, accept and use contributions from the members, employees or stockholders of such entity and any individual or group of individuals who accept and use contributions to influence or attempt to influence the action of voters. Such committee shall be formed no later than 30 days prior to the election for which the committee receives contributions or make expenditures".

In enforcing [§ 130.011(10)], the Commission has not refused to accept a statement of organization filed by a continuing committee after the thirtieth day before an election, has not otherwise refused to recognize such a continuing committee's existence or registration, and has not taken any action to prevent a continuing committee from making or receiving contributions or expenditures in connection with an election if the committee has not filed a statement of organization by the thirtieth day prior to that election. The Commission has found that continuing committees that failed to file a statement of organization by the thirtieth day before an election for which they receive contributions or expenditures have violated the deadline set by § 130.011(10) and has entered agreements with treasurers of those committees for the payment of fees pursuant to the Commission's authority under § 105.961.4(6), Mo.Rev.Stat.

*Lamb Affidavit* ¶ 13, Exhibit 1 to Defendants' Motion for Summary Judgment.

How the MEC would handle the "fee" for failing to file prior to the 30 day window would have a significant impact on whether the state's regulations were narrowly tailored to the alleged compelling state interest of voter education.[11] A $250 fine would be a *de minimis* burden on the Plaintiffs while preserving the importance of full disclosure. On the other hand, a $2 million fine would be a different matter. Alternatively, if the State of Missouri were to prohibit any speech within the 30 days prior to the election because of a failure to

register, the dispute would be more like the one brewing over the Bipartisan Campaign Finance Reform Act of 2001, recently passed by Congress and signed into law by President Bush. That statute creates a blackout period for issue advocacy in the 30 days immediately preceding an election.

Unlike the Finance Reform Act of 2001, § 130.011(10) does not on its face limit issue advocacy or express advocacy in the 30 days before an election. It states that registration of the committee shall occur no later than 30 days before election day. It does not say that speech is limited when registration has not occurred. Knowing the state's response to late registration, therefore, would be important when evaluating the constitutionality of the statute.

Delayed review will work no hardship on the Plaintiffs because they can seek clarification from the MEC or file a timely TRO should the problem ever repeat itself. "[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300, 118 S.Ct. 1257. In the meantime, the 30 day limit in the Finance Reform Act of 2001 will no doubt be challenged and the United States Supreme Court will speak on the issues surrounding a 30 day limit.

1. **Counts Two, Three and Four—30 Day Black Out, 14 Day Delay and Privileges and Immunity Clauses— § 130.049**

For the same reasons previously stated, Plaintiffs do not have standing to challenge

---

**11.** Defendants claim that there is a compelling state interest in the 30 day registration requirement. By requiring committees to identify themselves and their activities in advance of the election, voters learn about who is supporting whom in the election and opponents are given time to respond. Absent a registration requirement and disclosures, this information might not be available until after

the election, or in such close proximity to it that voters cannot make an informed choice. In other words, the 30 day requirement gives everyone the opportunity to be informed about issues and to speak. Normally, it is a minor burden for those covered by the statute. Candidates are identified months before election day.

statutes that are only applicable to committees domiciled outside Missouri that spend less than $1,500 in a Missouri election. There is nothing in the record to suggest that NRLPAC or NRLC intend to participate in future Missouri elections where they will spend less than $1,500.

### 2. Count Six—Bright Line Test— § 130.011(10)

In Count Six, NRLC makes a facial challenge to § 130.011(10), claiming that it does not adhere to the "bright line test" in *Buckley v. Valeo.* It argues that § 130.011(10) is over broad because it regulates issue advocacy as well as express advocacy and is therefore facially unconstitutional; i.e., is inapplicable to everyone, even those who might be constitutionally subject to a properly drawn regulation such as groups that only engage in express advocacy. Alternatively, it argues that § 103.011(10) is vague and, as such, chills the First Amendment rights of organizations which wish to engage in issue advocacy. Alternatively, it seeks to invalidate this statute as applied to it. It also seeks to invalidate any other state statute that is based on the definition of a "continuing committee" contained in § 130.011(10).

The Court has not found in the record a copy of "issue advocacy" that NRLC intends to use in the future, or even a copy of the "issue advocacy" that NRLC prepared for use in the last gubernatorial election. The sole piece of campaign literature that contains a reference to the Holden/Talent race is found in Exhibit E, Plaintiffs' Motion for Summary Judgment. That exhibit clearly is an example of express advocacy, and by Plaintiffs' admission, would be subject to regulation under *Buckley v. Valeo.*[12]

NRLC seems to be saying that it intends to engage in unidentified issue advocacy in the future and wants an order that it is permitted to do so without being treated as a "continuing committee" as that term is defined in § 130.011(1). To decide that issue, however, a Court would first need to determine that the intended communication was in fact "issue advocacy" and not "express advocacy". More important, there would have to be a possibility that the state would interpret § 130.011(10) to apply to NRLC's "issue advocacy" and then threaten to enforce the statute against it.

To support its argument that it is subject to a credible threat of adverse enforcement, NRLC relies on Mike Reid's letter of November 1, 2000. That letter, however, has a plausible and, in fact, likely interpretation that does not run afoul of *Iowa Right to Life Committee v. Williams,* 187 F.3d 963 (8th Cir.1999). In *Iowa Right to Life Committee,* the Eighth Circuit struck down an Iowa Campaign Ethics and Disclosure Board regulation which defined express advocacy to include communications which "when taken as a whole and with limited reference to external events, ... could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) ...." *Id.* at 969. *Also see Federal Election Commission v. Furgatch,* 807 F.2d 857, 858 (9th Cir.1987), *cert. denied* 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 106 (1987). In *Iowa Right to Life Committee,* the Eighth Circuit stated "[Q]uestions of intent and effect

---

12. In a letter to Michael Reid, Plaintiffs' attorney gave an example of the kind of issue advocacy that his clients had used in the past, but it did not appear to be an actual piece of campaign literature that was to be distributed in the Holden/Talent race. If it was the ad intended to be used in the gubernatorial campaign, it would clearly qualify as "issue advocacy."

... are to be excluded from the analysis, since a speaker, in such circumstances, could not safely assume how anything he might say would be understood by others". *Iowa Right to Life Committee,* 187 F.3d at 969.

The law, therefore, is clear in the Eighth Circuit, and has been since 1999, that the intent and effect of speech cannot be used to define express advocacy. Given this clear precedent, it is not reasonable to assume that Michael Reid or the MEC were trying to subject Plaintiffs to a standard invalidated in *Iowa Right to Life Committee.* Rather, the letter should be read to mean that there is no exhaustive list of words or statements that will be considered express advocacy. For example, campaign literature might not use the words "vote for", "elect", "support", "cast your ballot for Jim Talent", or "vote against", "defeat" or "reject Bob Holden". It might, however, say "Jim Talent is pro-life. Please make him our Governor" or "Jim Talent is pro-life. We choose Jim Talent for Governor. We hope you will also." The line might become even more diffuse with the following: "John Ashcroft is pro-life. Please give him your support." If such a statement had occurred three days before the November 2000 election, it might be express advocacy. If it occurred while John Ashcroft was not running for office, but was instead under fire during his confirmation hearing for Attorney General, it would not be express advocacy, because that is a term of art with meaning only in the context of electioneering.[13]

It is not surprising then that a state bureaucrat who receives a letter from a lawyer about the "bright line test" would be circumspect in his reply; especially when the lawyer asks the employee to "just initial" his acceptance of a carefully drafted statement interpreting Missouri law which contains nuanced language that might only be understood by an expert in the field of campaign finance law.[14] Furthermore, Mike Reid did not have the authority to give a legal opinion concerning the application of § 130.011(10).

Finally, the Court has already ruled that any dispute arising out of the 2000 election is moot. The focus, therefore, is prospective. Charles Lamb, Director of the MEC, filed an affidavit in which he states that the MEC has never "directed an entity to file a statement of organization as a committee or continuing committee or comply with other registration, record keeping or reporting requirements ... in the absence of language in the communications that expressly advocates the election or defeat of a clearly identified candidate ...." Nor, according to Lamb, has MEC ever taken into account "factors other than the language of an entity's communication [when] ... determining whether the entity's spending on communications cause the entity to be considered a 'committee' under 130.011(7) or a 'continuing committee' under 130.011(10)." Exhibit 1, Defendants' Motion for Summary Judgment. Except for Mike Reid's letter in which he refuses to give an opinion, the Plaintiffs have not pointed to any evidence that Missouri has interpreted § 130.011(10) or § 130.011(7) to include issue advocacy.

The statute in question is nearly 25 years old and the Commission has never ordered a group to make disclosures that are inconsistent with the bright line test

---

**13.** The "bright line test" is also a term of art drawn from *Buckley v. Valeo.* Anyone who works with words for a living knows that there are few bright lines. This is one of the reasons that courts are reluctant to give advisory opinions on hypothetical questions.

**14.** The record does not suggest that Mike Reid has such expertise, regardless of his job description.

articulated in *Buckley*. Moreover, there is nothing on the face of the statute to prevent it from being construed and enforced in a constitutional manner. It is, therefore, more likely than not that the state will apply the statute consistently with *Buckley v. Valeo*. Given this record, the Court finds that Plaintiffs' claims concerning § 130.011(10), and its companion statutes, do not constitute a live case or controversy. Alternatively, it finds that the claims are insufficiently focused to be ripe.

### 4. Count Five—Major Purpose Test—Primarily §§ 130.011(7), 130.011(10), 130.021—Secondarily §§ 130.031, 130.032, 130.036, 130.041, 130.046, 130.049, 130.050, 130.058, 130.072 and 130.081

NRLC contends that *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986), established the "Major Purpose Test." According to Plaintiff, this test prohibits governments from imposing PAC registration and reporting requirements on any organizations unless the major purpose of the organization is to make independent expenditures or to make contributions to candidates.[15] Therefore, according to NRLC, an issue advocacy group, such as NRLC, should not be subject to PAC regulations, even though it makes occasional independent expenditures, so long as making independent expenditures is not its major purpose. NRLC claims that § 130.021 contains PAC-like regulations that apply to every "committee," including "continuing committees". They also claim that NRLC would be treated as a "committee" or a "continuing committee" under §§ 130.011(7) and 130.011(10), and there-

fore is impermissibly subjected to PAC regulations.

NRLC reaches this conclusion based on two phrases in § 130.011(7) and § 130.011(10). First, the statutes apply to groups "whose purpose is to influence or attempt to influence voters." As in its argument concerning the application of the bright line test, NRLC contends this means that groups which do issue advocacy are covered by the statute in violation of *Buckley v. Valeo*. As previously indicated, however, this language is capable of a narrowing construction to apply only to groups which have the purpose of influencing voters with express advocacy. As narrowed, the statutes would read as follows:

"(7) **"Committee"**, a person or combination of persons, who accepts contributions or makes expenditures for the primary or incidental purpose [of engaging in express advocacy]."

"(10) **"Continuing Committee"**, a committee of continuing existence . . . whose primary or incidental purpose is to receive contributions or make expenditures [to engage in express advocacy]."

"Incidental" is the second phrase in these statutes which runs afoul of the major purpose test according to NRLC. Even when narrowed, the plain language of the two statutes covers an issue advocacy group that incidentally engages in express advocacy. Hence, if there is a major purpose test, and if NRLC makes an independent expenditure in a future election, and if the state enforces the statute against it, NRLC would be unconstitutionally subject to PAC requirements.

Whether the state will subject NRLC to PAC-like regulations in those circumstances depends in part on the meaning of

---

**15.** Plaintiffs concede that states can require issue advocacy groups to disclose spending for independent expenditures. It is the PAC reporting and organizational obligations that NRLC is objecting to.

§ 130.011(7)(c), which creates an exemption for certain corporations. Section 130.011(7)(c) reads in pertinent part:

> A corporation, . . . organized or operated for a primary or principle purpose other than that of influencing or attempting to influence the action of voters for or against the nomination or election to public office of one or more candidates . . . and it accepts no contributions, and all expenditures it makes are from its own funds or property obtained in the usual course of business or in any commercial or other transaction and which are not contributions as defined by subdivision (12) of this section.

The state claims that this section creates an exemption for NRLC from the definition of either a "committee" or a "continuing committee," and therefore NRLC is not subject to PAC-like regulations. NRLC, however, insists that it is not exempt and would be subject to PAC regulations if it made an independent expenditure in a Missouri election in excess of $1,500.

Whether or not issue advocacy groups are subject to exemption under § 130.011(c) is not readily apparent from the face of the statute because some of its terms are statutorily defined in a way different from their ordinary meaning. Both Plaintiff's and Defendants' arguments concerning this exemption are convoluted and occasionally strained. At any rate, NRLC never made an independent expenditure and never was told that it would be treated as a "continuing committee" if it made an independent expenditure. Hence, NRLC was never threatened with enforcement of the statutes it seeks to invalidate. Nor is there any indication in the record it decided not to participate' in the 2000 Missouri election because it might be subject to PAC regulations for any independent expenditure.

While NRLC may have a concern about how PAC regulations will be applied to it for its future independent expenditures, it has the option of seeking an opinion from the MEC. Moreover, it is unclear how likely it is that NRLC will make an independent expenditure in a future Missouri state election. When Governor Carnahan died, it was NRLPAC that initiated contact with the MEC to determine the propriety of making an independent expenditure. Only after NRLPAC was unsuccessful did NRLC even consider making independent expenditures.

Given these circumstances, the Court declines to exercise its jurisdiction to give a declaratory judgment on the issue. Major surgery on an ambiguous state statute should be undertaken only if there is a reasonable likelihood that it will create a problem for the litigants in the future and chill First Amendment rights. If NRLC wants to know whether the state will treat it as a "continuing committee," it need only seek an opinion from the MEC. If the MEC opines that NRLC will be treated as a "continuing committee" if it makes an independent expenditure in a Missouri state election, there is time enough to schedule surgery.

The Court has declined to address Counts One, Five and Six because Plaintiffs either lack standing or because their claims are not ripe. In doing so, the Court has considered *Minnesota Citizens Concerned for Life v. Federal Election Commission,* 113 F.3d 129 (8th Cir.1997), *Arkansas Right to Life State Political Action Committee v. Butler,* 146 F.3d 558 (8th Cir.1998), *Wisconsin Right to Life, Inc. v. Paradise,* 138 F.3d 1183 (7th Cir.1998), and *North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705 (1999). Plaintiffs argue that *Minnesota Citizens Concerned for Life, Arkansas Right to Life State*

*Political Action Committee* and *North Carolina Right to Life, Inc.*, demonstrate that their claims are justiciable. Defendants rely on *Wisconsin Right to Life, Inc. v. Paradise* to demonstrate that their claims are nonjusticiable. The Court is bound by Eighth, not Seventh or Fourth, Circuit precedent, so unless *Minnesota Citizens Concerned for Life* and *Arkansas Right to Life State Political Action Committee* are distinguishable, the Court would not consider cases from other circuits. *Minnesota Citizens Concerned for Life* and *Arkansas Right to Life State Political Action Committee* are distinguishable.

In *Minnesota Citizens Concerned for Life v. Federal Election Commission*, 113 F.3d 129 (8th Cir.1997), a regulation of the FEC was found to violate the First Amendment rights of Minnesota Citizens Concerned for Life ("MCCL"). The regulation in question was similar to a Minnesota statute that had previously been struck down by the Eighth Circuit in *Day v. Holahan*, 34 F.3d 1356 (8th Cir.1994). The Eighth Circuit noted in *Minnesota Citizens for Life* that: "The FEC's public comment stated that our contrary position in *Day* 'is controlling law in only one circuit, is contrary to the plain language used by the Supreme Court in [Massachusetts Citizens for Life], and therefore is of limited authority.'" *Id.* at 130 (quoting 60 Fed.Reg. 35292, 35297 (1995)). MCCL filed a pre-enforcement challenge to the FEC regulation relying on the Eighth Circuit prior opinion in *Day*. The Eighth Circuit found the challenge was ripe for adjudication "or, stated differently, ... the district court's discretionary authority to grant declaratory relief was properly exercised." *Minnesota Citizens Concerned for Life*, 113 F.3d at 131.

In so deciding, the Court recognized that " 'an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.'" *Id.* at 132 (quoting *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)). Nonetheless, the Court took two factors into account to decide that the statutory challenge in this case was ripe. Those two factors were (1) fitness for immediate judicial review, and (2) whether failure to review would create hardship for the parties. *Id.* at 132. "Fitness for judicial decision means, most often, that the issue is legal rather than factual. Sufficient hardship is usually found if the regulation ... chills First Amendment activity." *Id.* at 132.

In *Minnesota Citizens Concerned for Life*, the facial challenge to the statute could be readily resolved because the Eighth Circuit law was clear. The issue had already been decided in *Day*—easy answer. Also, for an administrative agency to effectively discount circuit precedent suggests it might plausibly challenge MCCL's conduct under the standard established by its national administrative regulation rather than the standard established by the Eighth Circuit—unwise approach. Finally, in *Minnesota Citizens Concerned for Life*, the only ruling made by the Eighth Circuit was that the FEC regulation must conform to the Eighth Circuit's ruling in *Day*. It did not determine whether MCCL was or was not entitled to the exemption in *Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). Plaintiffs have not just asked for a ruling that Defendants must comply with Eighth Circuit and United States Supreme Court precedents. They have asked for a declaratory judgment as to when and how numerous Missouri statutes should be applied to them under controlling Supreme Court and Eighth Circuit precedent.

The second case the Plaintiffs rely on to support their position that their claims are justiciable is *Arkansas Right to Life State Political Action Committee v. Butler*, 146 F.3d 558 (8th Cir.1998). In that case, the Eighth Circuit considered whether the Arkansas Right to Life State Political Action Committee had standing to challenge a state statute which prohibited campaign contributions in excess of $100 for certain offices and $300 for other offices. The Court found that the plaintiffs had alleged that they intended to make contributions in excess of these limits and that was sufficient to demonstrate an "injury in fact." In *Arkansas Right to Life State Political Action Committee*, however, the caps were either constitutional or not. The statute could not be applied in a way that would preserve its constitutionality. Moreover, by alleging that they would spend in excess of $100, the plaintiffs clearly demonstrated that they would violate the statute. The parameters of the dispute were clearly defined. Not so in this case.

Given that the question of whether to issue declaratory judgment is discretionary, *see Minnesota Citizens Concerned for Life v. Federal Election Commission*, 113 F.3d 129, 131 (8th Cir.1997), the Court exercises its discretion to decline. The better course would have been for NRLC and NRLPAC to seek an immediate temporary restraining order on or about October 17. NRLPAC was told by "Mike" on that day that NRLPAC could not make an independent expenditure within 30 days of the election. That issue could have been addressed in the trial court within a matter of days, if not hours, and the issue would be preserved for appeal under *Van Bergen*. The Federal Rules of Civil Proce-

dure even permit such an order to be issued *ex parte*. Fed.R.Civ.P. 65. After learning that Governor Carnahan had been in a plane crash on the evening of October 16, NRLPAC moved immediately to prepare campaign literature that was to be distributed on October 17, less than 24 hours after the crash. Yet, after being told on October 17 that they couldn't distribute their campaign literature, they took no legal action until November 7. Absent NRLPAC's objectives being addressed in some other way or the Plaintiffs' focus being redirected, it is inexplicable why a TRO was not sought.[16] If a temporary restraining order had been sought, the action to be taken by NRLC and NRLPAC would be well defined, the response of the government clear and the constitutional claims narrowed. Instead, Plaintiffs waited and are now claiming that a labyrinth of statutes pose a threat to their future First Amendment rights, even though some of these statutes and the disputes identified by Plaintiffs are mutually exclusive.

For example, if Plaintiffs' spend under $1,500, certain statutes apply, but if they spend over $1,500, other statutes apply. If NRLC engaged in issue advocacy only, they would not be subject to PAC regulations. *Buckley v. Valeo*. If it was making incidental independent expenditures, however, the question of the major purpose test arises. Whether they made their expenditures before or after the 30 day cut-off would make a difference in which, if any, statute posed a threat to them.

In effect, Plaintiffs are hypothesizing that they might proceed one way and they might proceed another, but they want the Court to assume they are going to do each

---

16. While campaign finance law is complex, NRLPAC is represented by the law firm that has been extensively involved in campaign finance litigation around the country. If NRLPAC wanted judicial intervention to permit it to distribute its campaign literature, its counsel was well equipped to take action.

so they can get a definitive ruling on their options. Such advisory opinions are not contemplated by the case and controversy requirement and ancillary doctrines that an Article III judge is subject to. Nor will Plaintiffs be injured by the Court's finding that their claims are nonjusticiable. Plaintiffs can obtain opinions from MEC and return to federal court if MEC takes a position contrary to the Defendants' position in this suit. The federal court will then be called on to address only those matters that are really in dispute.

In this regard, Judge Easterbrook's opinion in *Wisconsin Right to Life, Inc. v. Paradise*, 138 F.3d 1183 (7th Cir.1998), is instructive. There, Wisconsin Right to Life ("WRTL") published voter guides identifying pro-life candidates. Like NRLC, WRTL believed that "its issue guides, flyers and advertisements are political speech protected by the first amendment, and that it need not register as a political committee on their account ... because the speech is ... not 'express' advocacy of candidates' elections [and] also because WRTL's 'major purpose' is unrelated to the election of particular candidates." *Wisconsin Right to Life*, 138 F.3d at 1184. As in this case, no one had ordered WRTL to register as a political committee, nor had WRTL been sanctioned or threatened with suit for not registering. The district court found that WRTL had standing to sue but found *Pullman* abstention was appropriate.[17]

The Seventh Circuit reversed finding that WRTL did not even have standing to pursue its claim in federal court, and therefore *Pullman* abstention was improper. The Seventh Circuit concluded that WRTL was effectively asking for an advisory opinion. As in Missouri, the Wisconsin Supreme Court had not addressed the

bright line/major purpose test, even though the statute was more than 25 years old. The Seventh Circuit concluded that WRTL's apprehension about future enforcement was not well founded.

Plaintiffs argue that WRTL is distinguishable from the facts in this case because there was a Wisconsin Attorney General's opinion advising the board that the "approach articulated in *Buckley* should be applied." No such opinion exists in Missouri. Nonetheless, the State of Wisconsin, like Missouri, must follow *Buckley*, not because an Attorney General says so, but because the United States Supreme Court has so ruled. Likewise, the State of Missouri must follow *Iowa Right to Life Committee*, 187 F.3d at 963, because the Eighth Circuit has so ruled. Other than Mike Reid's pre-election, ambiguous letter, there is no evidence that Missouri will interpret its statutes to be inconsistent with *Iowa Right to Life Committee* and *Buckley v. Valeo*, and then try to enforce them against Plaintiffs.

In *WRTL*, there was in fact a more credible threat of legal action than present in this case; still the Seventh Circuit found no standing. In 1996, the Wisconsin Election Board seemed to define political committee using the "context" approach articulated in *Federal Election Commission v. Furgatch*, 807 F.2d 857 (9th Cir.1987), and rejected by the Eighth Circuit in *Iowa Right to Life Committee v. Williams*, 187 F.3d 963 (8th Cir.1999). Based on this context approach, the board ordered certain organizations to register as political committees, threatening them with subpoenas if they did not register. The Seventh Circuit, however, first noted "[n]o one has threatened WRTL with sanctions or ordered it to register as a political commit-

---

17. It appears that there was a state case pending at the time suit was filed in federal court but it involved different organizations.

tee, ...." *Wisconsin Right to Life,* 138 F.3d at 1184. "WRTL's argument accordingly must be that the Wisconsin campaign laws are unconstitutional as written rather than as applied—in legal jargon, that the statute is unconstitutional on 'its face' unless understood to mean what *Buckley* says the Federal Election Campaign Act means. WRTL makes this explicit by arguing that the state law cannot be construed in a constitutional way and therefore must be invalidated *en toto*." *Id.* at 1186. This is the same position taken by NRLC. The Seventh Circuit found no standing because

> [a] litigant cannot create a case or controversy just by making an untenable "facial" attack on a statute; actual injury and redressability are essential no matter how the challenge is cast.... A judgment along the lines of "Dear Board, you must follow *Buckley*" or "apply the state law only to explicit advocacy" would not dictate one outcome rather than another in the sort of cases about which WRTL is concerned. To relapse into jargon, the injury WRTL fears is not redressable by an order of the kind it seeks. Perhaps a more elaborate injunction, one that tried to lay down the right answer in *Travis* and other cases besides, could provide relief, but such an order would exceed the constitutional powers of the federal judiciary under Article III.

*Id.* at 1186–87.

Admittedly, the Fourth Circuit has taken a more liberal approach to the definition of a case or controversy. *North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705 (1999). Nonetheless, that case is distinguishable in a critical way. In *North Carolina Right to Life, Inc.,* the plaintiffs had gone to the State Board of Elections and had given the Board a sample copy of the voter guide it wished to distribute. Apparently, plaintiffs inadvertently included a page containing express advocacy in that sample. When an official from the State Board of Election stated that the guide would be subject to regulation, the plaintiffs submitted a second sample voter's guide that, according to the Fourth Circuit, only contained issue advocacy. The official then stated that the guide would be subject to regulation. Hence, a specific example of the advocacy in question had been reviewed and an official of the Board had decided how the campaign literature would be regulated.

Neither the NRLC or NRLPAC has sought an opinion from MEC, nor did it pursue a TRO when NRLPAC was told by "Mike" that it could not participate in the election. If the case or controversy doctrine is to have any vitality in the context of campaign finance, it is better to wait for a concrete dispute to arise before tackling these challenging and diverse statutory construction questions.

### 5. Count 7—Resident Treasurer— § 130.021(10)

In Count Seven, NRLPAC seeks to invalidate § 130.021(10), which requires an out of state committee to appoint a Missouri resident as treasurer if it intends to make expenditures in a Missouri election in excess of $1,500. NRLPAC is clearly subject to Missouri's definition of "continuing committee" because its major purpose is to make contributions to candidates and to expressly influence voters to identify pro-life candidates. Both Plaintiffs and Defendants agree that NRLPAC falls within the definition of a committee. While there has been no threat of enforcement, there is no ambiguity as to whether § 130.021 (10) would adversely affect NRLPAC's future rights in a Missouri election. Thus, this case is analogous to *Arkansas Right to Life State Political Action Committee v. Butler,* 146 F.3d 558 (8th Cir.1998), where the Eighth Circuit

held that where an organization said they were going to be involved in an election and spend more than $300, the organization would necessarily be deterred by Arkansas's campaign contributions of $300. Because NRLPAC has indicated that it intends to participate *ad infinitum* in Missouri state elections and they will clearly be subject to the requirement that an out of state committee have a resident treasurer, NRLPAC has standing to challenge the statute. The issue is also ripe because further factual development would not aid the Court in resolving this statute's validity. The Court turns now to the merits of the dispute.

The Plaintiffs challenge § 130.021.10, asserting that it violates NRLPAC's right of association by requiring it to appoint a Missouri resident as treasurer, thereby impermissibly interfering with its internal affairs. Although political association is at "the core of those activities protected by the First Amendment," these associational rights "are not absolute and are necessarily subject to qualification if elections are to be run fairly and effectively." *Republican Party of Arkansas v. Faulkner County, Arkansas,* 49 F.3d 1289, 1292 (8th Cir. 1995) (quoting *Elrod v. Burns,* 427 U.S. 347, 356, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Munro v. Socialist Workers Party,* 479 U.S. 189, 193, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)). NRLPAC's associational rights can be limited here because the MEC has proposed a state interest in enforcing its campaign finance regulations that is sufficiently compelling to outweigh the Plaintiffs' First Amendment concerns.

▆▆▆ The Supreme Court has employed two different standards of review for evaluating challenges to election laws. *Republican Party of Arkansas,* 49 F.3d at 1296. In some cases, the Court has used a flexible test, tailoring the level of scrutiny to the seriousness of the burden imposed by the challenged law; while on other

occasions, it has suggested that all election and voting regulations must be subjected to strict scrutiny. *Id.* In cases where the internal affairs of political parties are at issue, the Supreme Court has applied strict scrutiny to hold that these internal affairs are off-limits to state regulation absent a compelling state interest. *Republican Party of Arkansas,* 49 F.3d at 1294; *Eu v. San Francisco County Democratic Central Comm.,* 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). When state election laws severely restrict the right of association, as in cases where the internal affairs of political parties are regulated, the laws must be narrowly drawn to serve a compelling state interest. *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135, 145 (2nd Cir. 2000) (quoting *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)). In contrast, when a state imposes only reasonable, nondiscriminatory restrictions on the right of association, the state's regulatory interests are usually sufficient to justify the restrictions. *Id.* Deciding what standard of review to apply "requires a particularized assessment of the nature of the restriction and the degree to which it burdens those who challenge it." *Id.* at 146.

▆▆▆ If a compelling state interest is required before a state can regulate the internal affairs of political parties, then the same constitutional protection should apply to private political committees, such as Plaintiff NRLPAC. *Republican Party of Arkansas,* 49 F.3d at 1295. However, "even among restrictions that touch upon the core First Amendment rights to political speech and association, some restrictions are more burdensome than others, depending on the kind of activity that is restrained and on the nature of the restraint." *Republican Party of Minnesota v. Kelly,* 247 F.3d 854 (8th Cir.2001); *Tim-*

*mons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (standard of review depends on the character and magnitude of the burden on associational rights). Although § 130.021.10 imposes a heavy burden on the NRLPAC, it does not interfere with NRLPAC's internal affairs to the same extent as the laws in the political party cases cited by the Plaintiffs. For example, in *Republican Party of Arkansas,* any party seeking to have its candidates on the general election ballot was required to conduct and pay for its own primary election. *Republican Party of Arkansas,* 49 F.3d at 1291. In *Eu,* the challenged laws regulated the internal affairs of the governing bodies of political parties by dictating the size and composition of the state central committees, governing the selection and removal of committee members, fixing the maximum term of office for the chair of the state central committee, and requiring that the chair rotate between residents of northern and southern California. *Eu,* 489 U.S. at 218, 109 S.Ct. 1013.

In contrast, § 130.021.10(2) requires that any political committee domiciled outside of Missouri must appoint a Missouri resident as treasurer if its independent expenditures in Missouri exceed $1,500. Plaintiff NRLPAC intended to make independent expenditures exceeding $1,500 with respect to the Missouri gubernatorial election held on November 7, 2000. *See* Plaintiffs' Complaint at ¶ 26. If NRLPAC had done so, it would have been required to appoint a Missouri resident as treasurer, in addition to opening a financial account in a Missouri bank and registering with the MEC. Plaintiffs argue that these requirements would have interfered with NRLPAC's internal affairs and precluded NRLPAC from making its intended independent expenditure, or at least limited that expenditure to $1,500. The Plaintiffs first claim that there would not have been sufficient time to find, train, and appoint a

Missouri resident to be NRLPAC treasurer. Second, Plaintiffs assert that the NRLC By–Laws allow only one treasurer for both NRLC and NRLPAC, and that position was already filled by Plaintiff Amarie Natividad. *See* NRLC By–Laws, Exhibit I at Article V § 1. However, even if § 130.021.10 imposes a sufficiently heavy burden on NRLPAC's internal affairs to support strict scrutiny, the MEC has asserted a compelling state interest adequate to justify the Missouri resident treasurer requirement.

Although NRLPAC has an interest in controlling its own internal operations, the MEC has a compelling interest in enforcing its campaign finance regulations to preserve the integrity of the election process. Hence, may enact laws that interfere with a party's internal affairs when necessary to ensure that elections are fair, honest, and orderly. *Republican Party of Arkansas,* 49 F.3d at 1300 (quoting *Eu,* 489 U.S. at 231, 109 S.Ct. 1013). In *Eu,* the Court distinguished between permissible "infringement on the associational rights of the parties and their members [that] was the indirect consequence of laws necessary to the successful completion of a party's external responsibilities in ensuring the order and fairness of elections," and direct regulation of a party and its leaders designed to reduce intraparty friction. *Eu,* 489 U.S. at 232–33, 109 S.Ct. 1013 (invalidating regulation enacted for the purpose of managing political parties' internal affairs, not for preserving the integrity of the electoral process). Missouri's resident treasurer requirement is narrowly tailored to ensure that each committee provides an individual who is accountable for compliance with the provisions of the disclosure law and can be easily reached by judicial process. Accordingly, Missouri law requires that each continuing committee must have a treasurer who is responsible for the various rec-

ord keeping and filing requirements established by law. *See* §§ 130.021.5, 130.031.2, 130.036, 130.041, 130.058. Thus, the treasurer is the critical official that the Commission must reach to investigate and address violations of the campaign finance laws.

The MEC possesses subpoena authority and the ability to pursue actions in Missouri circuit courts. *See* §§ 105.955.15(1), 105.961.4, .5, and .8(4). But the practical and legal burdens of having to pursue out-of-state treasurers—such as travel time and expense for staff and the time, expense, and uncertainty associated with extraterritorial enforcement of investigative subpoenas and service of process—would limit the MEC's ability to enforce Missouri's law. Indeed, similar considerations were cited recently by the Eighth Circuit in rejecting a First Amendment challenge to North Dakota's residency requirement for persons collecting signatures on initiative petitions. *Initiative & Referendum Institute v. Jaeger,* 241 F.3d 614, 616–17 (2001). The Court reasoned that the state had a compelling interest in using its subpoena power to prevent fraud and protect the integrity of signature gathering, and the regulation did not unduly restrict speech since many alternative means remained for non-residents to communicate their views on political initiatives. *Id.* (citing *Buckley v. American Constitutional Law Found., Inc.,* 525 U.S. 182, 196–97, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999)). Accordingly, the Missouri resident treasurer requirement is a valid limitation on NRLPAC's associational rights because it is narrowly tailored to serve the MEC's compelling interest in using its subpoena power to enforce the disclosure law, thereby serving its related informational and anti-corruption interests.